Lynne KRUGER, Maxwell Kruger, Lawson Kruger, and Sheldon Kruger, Plaintiff,

v.

**VIRGIN ATLANTIC AIRWAYS, LIMITED, Defendants.**

No. 11–CV–2954 (NGG)(RER).

United States District Court, E.D. New York.

Sept. 30, 2013.

Thatcher A. Stone, New York, NY, for Plaintiffs.

Christopher Carlsen, Clyde & Co. LLP, New York, NY, for Defendants.

## MEMORANDUM & ORDER

NICHOLAS G. GARAUFIS, District Judge.

Lynne Kruger ("Mrs. Kruger"), Sheldon Kruger ("Mr. Kruger"), and their adult sons Maxwell and Lawson Kruger filed this action alleging breach of contract, false arrest, malicious prosecution, intentional infliction of emotional distress, negligence, and loss of consortium against Virgin Atlantic Airways, Limited ("VAA"). The court received a motion for summary judgment from both Defendant and Plaintiffs. The court referred both motions to Magistrate Judge Reyes for a Report and Recommendation ("R & R"). On August 13, 2013, Judge Reyes returned his Report and Recommendation to this court. (R & R (Dkt. 48).) Plaintiffs objected to portions of the R & R, and their objections

are now before the court. For the reasons explained below, Magistrate Judge Reyes's Report and Recommendation is ADOPTED.

## I. BACKGROUND

### A. Facts

Except where otherwise noted, the following facts are undisputed. On August 22, 2010, Plaintiffs bought four non-refundable round-trip tickets for a family vacation. They planned to travel on Virgin Atlantic Airlines from Newark, New Jersey, to Delhi, India via London. (R & R at 305–06.) All tickets were e-tickets purchased online and subject to VAA's Conditions of Carriage. (*Id.*) Plaintiffs' departure flight from Newark was originally scheduled for December 23, 2010. (*Id.*) On December 21, 2010, Defendant informed Plaintiffs via e-mail that their flight from Newark to London's Heathrow Airport had been cancelled due to "on-going runway restrictions" at Heathrow. These restrictions were the result of a snowstorm in London. (*Id.*) Plaintiffs attempted to book another VAA flight to London, but were unsuccessful. Ultimately, they booked flights to Bermuda and then to London's Gatwick Airport, from which they were able to travel to Heathrow. (Pl. Obj. to R & R (Dkt. 49) at 6.) They then used their existing tickets to fly with VAA from London to Delhi. (R & R at 305–06.)

Plaintiffs took their planned January 9, 2011, return flight from Delhi to London on VAA No. 301. (*Id.* at 306.) The flight from Delhi was divided into different sections, "upper class," premium economy, and economy. (*Id.*) Plaintiffs were seated in economy class. Plaintiffs' section of economy was set to deplane through a door in the middle of the aircraft, the L2 door. But economy and premium economy passengers were not allowed to disembark until after the upper class passengers had left the plane. (*Id.*) Due to delays in Delhi, the flight arrived late. (Skinner Decl. in Supp., Ex. 5 to Def. Mot. for Summ. J. (Dkt. 42) ¶ 8 ("Skinner Decl.").) Plaintiffs were anxious to make their connecting flight, VAA No. 17, to Newark. (L. Kruger Dep., Ex. 1 to Pl. Mot. for Summ. J. (Dkt. 43) at 40–44 ("L. Kruger Dep.").)

Mrs. Kruger was seated in row thirty-eight of the economy section. When the plane landed, she was the first passenger from the economy and premium economy sections to reach the L2 door. (R & R at 306.) Leanne Skinner was working as a flight attendant on flight 301, and was charged with watching the L2 door and insuring that upper class passengers had priority in leaving the plane. (*Id.*) Mrs. Kruger asked Ms. Skinner if she could disembark before the upper class passengers in order to make her connecting flight. Ms. Skinner said no. (*Id.* at 306–07.) Mrs. Kruger asked repeatedly if she could pass, receiving the same response. (*Id.*) Finally, the upper class passengers had all departed, and Ms. Skinner stood aside to let the economy and premium economy passengers through. (*Id.*) Parties disagree about whether VAA announced that it was holding the plane to Newark. (*Compare* L. Kruger Dep. at 42:5–14, *with* Skinner Decl. ¶ 8.)

As Mrs. Kruger exited the aircraft, her shoulder came into contact with Ms. Skinner's chest. (R & R at 306–07.) Ms. Skinner claims to have been in pain and that she sat down while the rest of the passengers left the plane. (*Id.*) At her request, the captain of the aircraft called the police. (*Id.*)

Ms. Skinner and VAA accuse Mrs. Kruger of intentionally "barg[ing]" into Skinner and calling her a "bitch." (*Id.*) Mrs. Kruger maintains that she tripped, and she believes that she may have been

intentionally tripped by Skinner. At her deposition, she testified: "I don't know if it was the flight attendant that tripped me. All I know is that when I stumbled, I saw a blue flight attendant shoe." (*Id.*) After the incident, Mrs. Kruger joined her family heading towards Gate 22 for their connecting flight.

Plaintiffs stopped at a transfer counter. They handed over their passports and boarding passes to a VAA staff person. Another staff member picked up their documents and walked them to the gate. (*Id.* at 307; *see also* S. Kruger Dep., Ex. 8 to Pl. Mot. for Summ. J. at 33:13–17, 37:20–24, 38:22–25 ("S. Kruger Dep.").) Gate 22 consists of a glass-enclosed seating area, from which passengers can directly board the plane, and a check in desk at the entrance to the area. (Def. Reply in Opp'n (Dkt. 50) at 6.) Passengers cannot enter the interior area without checking in at the desk. (Brunning Decl. in Supp., Ex. 6 to Def. Mot. for Summ. J. ¶ 5.)

Mr. and Mrs. Kruger might have been in line to check in to the Gate for a short while. (R & R at 307; S. Kruger Dep. at 39:11–12.) Defendant's staff stopped them. (*Id.*) They informed Mrs. Kruger that the police wanted to question her in connection with the incident with Ms. Skinner. Ms. Skinner had also walked to Gate 22 and was there, with police, when the Krugers arrived. (*Id.*) After questioning both Ms. Skinner and Mrs. Kruger, police told Mrs. Kruger that they wanted to speak with her further at the station. (*Id.*) The rest of the Kruger family was free to leave. The Krugers' sons, Maxwell and Lawson, boarded flight 17 as scheduled. Mr. Kruger decided that he could not leave the U.K. without his wife. (*Id.*) All four of the family's bags were checked under Mr. Kruger's name; they were off-loaded because he was not travelling on the flight. (*Id.*) Plaintiffs assert that De-fendant's staff handled this transaction in a harsh and abusive manner, calculated to shame and scare them. (Second Am. Compl. (Dkt. 23) ¶ 48.)

Police arrested Mrs. Kruger. (R & R at 307.) She was not placed in handcuffs or physically restrained. (*Id.*) The police then drove her and Mr. Kruger to the police station in a police van. Mr. Kruger waited at a nearby hotel while police questioned Mrs. Kruger. After approximately five hours, police released Mrs. Kruger in the early hours of the morning. (Data Protection Act Request (Kruger arrest record), Ex. 7 pt. 3 to Pl. Mot. for Summ. J.) She was not charged with any crime. (*Id.*)

Mr. and Mrs. Kruger returned to the United States on a British Airways flight later that day. (*Id.*) As a "customer relations gesture," Defendant refunded the $400.06 cost of Mr. Kruger's ticket from London to Newark. (*Id.* at 5.) Defendant sent Mrs. Kruger a letter banning her from any future travel with the airline. (*Id.* at 6.) On April 12, 2012, Defendant refunded the cost of the Krugers' outbound, Newark to Heathrow flight, in the amount of $1,414.20. (*Id.*)

Mrs. Kruger states that she has been seriously psychologically affected by the arrest. (Second Am. Compl. ¶¶ 48–49). She was taken to the hospital for a panic attack on July 3, 2011. (L. Kruger Dep. at 112:20–116:8.) She describes her relationship with her husband as severely strained. (*Id.* at 159:19–24.) A psychologist who treated her for a period in 2011 describes a number of anxiety-related ailments and states that "[a]ll of her symptoms are consistent with the condition of Post–Traumatic Stress Disorder." (Olson Ltr., Ex. 10 to Pl. Mot. for Summ. J.)

**B. Procedural History**

The Krugers filed this lawsuit against VAA and Jane Doe 1 (later identified as

Ms. Skinner), as well as VAA employees Paul Brunning and Andrew Blackwell. (Compl. (Dkt. 1).) They alleged breach of contract, negligence, loss of consortium, intentional infliction of emotional distress, false arrest, and false imprisonment. (*Id.*) Plaintiffs later amended their complaint to remove all claims against individual defendants, leaving VAA as the sole defendant. (First Am. Compl. (Dkt. 3).)

Plaintiffs filed motions for a pre-motion conference to request partial summary judgment and to amend their complaint on February 28, 2012. (Mot. for Pre–Mot. Conf. (Dkt. 17); Mot. to Amend (Dkt. 18).) Defendant opposed the motion because discovery was not yet complete. (Resp. in Opp'n (Dkt. 21).) The court referred the issue to Magistrate Judge Reyes for an R & R. (Feb. 29, 2012, Referral.) On June 14, 2012, Plaintiffs filed a second amended complaint to add a claim for malicious prosecution. (Second Am. Compl.)

Following further discovery, the parties moved for summary judgment on January 4, 2013, (Defendant) and January 11, 2013, (Plaintiffs). (Dkts. 42–43.) Judge Reyes issued his R & R recommending that Defendant's motion for summary judgment be granted and that Plaintiffs' motion be denied on August, 13, 2013. Objections to the R & R were listed as due on August 30, 2013, and Plaintiffs filed their objections on that date. On September 5, 2013, Defendant filed its reply. (Dkt. 50.) Defendant later filed a motion to withdraw the timeliness of objections argument contained in its original reply. (Dkt. 51.)

## II. STANDARD OF REVIEW

The court reviews portions of the R & R to which a party makes no objection for clear error. *U.S. Flour Corp. v. Certified Bakery, Inc.,* No. 10–CV–2522 (JS), 2012 WL 728227, at *2 (E.D.N.Y. Mar. 6, 2012). If one of the parties objects

to a portion of a magistrate judge's R & R, the court reviews that portion de novo. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. Pro. 72(b)(3). However, if the objections are "merely conclusory or general" or "simply reiterate his original arguments" those objections need only be reviewed for clear error. *Pall Corp. v. Entegris, Inc.,* 249 F.R.D. 48, 51 (E.D.N.Y.2008) (citation omitted). A district court will ordinarily refuse to consider new arguments, evidence, or law that could have been, but was not, presented to the magistrate judge. *Paterson–Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 995 (1st Cir.1988); *Gutman v. Klein,* 03–CV–1570 (BMC), 2008 WL 5084182, at *1 (E.D.N.Y. Dec. 2, 2008); *Kennedy v. Adamo,* 02–CV–1776 (ENV), 2006 WL 3704784, at *1 (E.D.N.Y. Sept. 1, 2006) (citing *Haynes v. Quality Markets,* 02–CV–250, 2003 WL 23610575, at *3 (E.D.N.Y. Sept. 22, 2003)). "A proper objection is one that identifies the specific portions of the R & R that the objector asserts are erroneous and provides a basis for this assertion." *DuBois v. Macy's Retail Holdings, Inc.,* 11–CV–4904 (NGG), 2012 WL 4060586, at *1 (E.D.N.Y. Sept. 13, 2012).

## III. DISCUSSION OF OBJECTIONS
### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden to make this showing rests upon the party moving for summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he court must draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133,

149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Both parties in this case made motions for summary judgment. Since the R & R primarily concerns Defendant's motion for summary judgment, Plaintiffs are the non-moving party.

A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[S]pecific facts" grounded in testimony or other admissible evidence create a genuine issue. *Id.* "[M]ere allegations or denials" of the adverse party's pleadings, *id.*, "assertions that are conclusory," *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir.2004), or "conjecture[ ] or speculation" from the non-movant, *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996), do not.

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. 2548 (citation omitted).

### B. Plaintiffs' Objections

Plaintiffs first object that Magistrate Judge Reyes did not hold hearings before issuing his report. (Pl. Obj. to R & R at 5). Plaintiffs also object to three portions of Judge Reyes's R & R: (1) the determination that Virgin had no obligation to cover, (2) the rejection of the EU law claim, and (3) the application of the Montreal Convention. (*Id.* at 6–25). Finally, they make a number of other observations that could be loosely construed as objections. (*Id.* at 25–26).

#### 1. *Hearings*

Plaintiffs' procedural objection regarding evidentiary hearings lacks foundation. (*See id.* at 5.) Although a judge may give a party that fails to properly support a material fact, or fails to address another party's assertion of fact, the opportunity to correct this failing, the judge is under no obligation to do so. Fed. R. Civ. Pro. 56(e). Plaintiffs and Defendant had sufficient time for discovery and had the opportunity to submit exhibits to accompany their summary judgment motions. The record reflects that they made ample use of this opportunity. Magistrate Judge Reyes held multiple conferences with the parties throughout this process. The Magistrate Judge also held a pre-trial conference on September 28, 2012. (Minute Entry for Sept. 28, 2012). The detailed R & R in this case demonstrates that Magistrate Judge Reyes had the necessary resources with which to determine that no genuine issues of material fact remained for trial. The court accordingly finds that Plaintiffs' objection with regard to additional hearings or evidence is without merit.

#### 2. *Breach of Contract*

Plaintiffs make two assertions of error with regard to the breach of contract claim for the outbound flight: (1) that Defendant had an obligation to cover, and not merely to compensate Plaintiffs, for the cancellation of the Newark to London flight, and that it should have booked an alternative flight to London for Plaintiffs, and (2) that the issue of whether snow caused the flight cancellation remains an issue of fact.

Plaintiffs also made breach of contract claims regarding their inbound flight from Heathrow to Newark. However, Plaintiffs raise no objection to the Magistrate Judge's recommendation that Defendant did not breach its contract with regard to carriage of their baggage, or with regard to refunds for Mr. and Mrs. Kruger. Having found no clear error in these recommendations, the court adopts them. All that remains is to examine the Magistrate's recommendations regarding the outbound, Newark to London, flight.

### a. Defendant's Obligations

■ Plaintiffs contest Judge Reyes's determination that VAA's contract of carriage did not require it to find Plaintiffs an alternate flight. They argue that, because they found another way to get to London, Defendant must pay the difference between the contract price and the cover price, as if they were engaging in a sale of goods covered by the Uniform Commercial Code. (See Pl. Obj. to R & R at 6.) However, parties had a contract for carriage, rather than for the sale of goods, and the Defendant's obligation was that of a common carrier, not a seller.

The fact that Plaintiffs were able to obtain alternate carriage to another airport in London is irrelevant to the legal question of whether Defendant was obligated to obtain it for them. The terms of the contract between Plaintiffs and Defendant are contained in the Conditions of Carriage, which is the only part of Defendant's customer service website referenced on the e-ticket. (E-ticket, Ex. A to Second Am. Compl. at 3 ("Notice of Incorporated Terms of Contract").) The court notes that the conditions of carriage provided to it appear to be from 2012, but that Plaintiffs purchased their tickets in 2010. Given that neither party has objected to the use of the 2012 contract, the court assumes that the relevant language is the same as

the language in the 2010 contract in all material respects. The relevant language states that if a flight is cancelled, VAA offers customers a choice: either it will refund the cost of the flight, re-route the customer at a later date, or, if possible re-route a customer, "on our earliest flight with suitable space available in the ticket class of service for which you have paid the fare, or at our option in comparable transport conditions." (Conditions of Carriage, art. 9.3.1.1(b), Ex. B to Carlsen Decl., Ex. 8 to Def. Mot. for Summ. J. ("Conditions of Carriage").) Defendant had no available flights that would have allowed Plaintiffs to make their connection. (R & R at 311; Wallace Decl. in Supp., Ex 9 to Def. Mot. for Summ. J. (Dkt. 42) ¶ 6.)

### b. Weather Cancellation

Although Plaintiffs claim that the issue of whether snow caused the flight cancellation is in dispute, they offer no evidence to support this claim. If the non-moving party objects to summary judgment on the grounds that an issue of fact exists, the objection must be based on more than mere "conjecture." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996). Plaintiffs have adduced no evidence demonstrating that flights were not cancelled due to snow in London. The fact that some flights could go to London area airports does not mean that all flights could go to Heathrow as scheduled. Simple denials that snow was the cause of the flight cancellation, (Pl. Obj. to R & R at 7), do not amount to a genuine issue of material fact.

Therefore, the court adopts Magistrate Judge Reyes's recommendations regarding these contract issues in full.

### 3. EU Regulation 261/2004 Claim

■ Plaintiffs also contest the Magistrate Judge's determination that European Community Regulation 261/2004 is inapplicable to the cancellation of their outbound

flight.[1] This regulation gives passengers on EU airlines a right to compensation for cancelled or delayed flights in some circumstances. Council Regulation 261/2004, 2004 O.J. (L46) 1(EC). Plaintiffs seem to have misread the R & R to suggest that foreign law claims are preempted by U.S. federal law. It is helpful for the court to clarify here that the federal preemption issue discussed by the Magistrate Judge applies to Plaintiffs' state law claims. In particular, Plaintiffs have claimed that, under the law of New York State, Regulation 261/2004 is incorporated by reference into their contract with Defendant. (Pl. Obj. to R & R at 7 (referring to "cross references in the Virgin contract of carriage.").)

■ Plaintiffs cannot bring a direct state-law claim because the Airline Deregulation Act ("ADA") preempts state laws regulating airline rates. *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 228, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). But they can bring a claim related to anything that Defendant explicitly incorporates into its contract. *Id.* at 228–29, 115 S.Ct. 817. State law thus provides no cause of action, but can be a guide to interpreting the contract. This leads to the difficulty of determining what law applies to the document.

Curiously, it has not been clearly established that New York law governs this contract. The contract that parties have provided to this court contains no choice of law clause. (*See* Conditions of Carriage.) Federal courts sitting in diversity cases typically follow the law of the forum on issues of substantive law. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). However, the Second Circuit has held that federal common law choice-of-law analysis applies to international air shipments. *Eli*

*Lilly Do Brasil, Ltda. v. Fed. Express Corp.*, 502 F.3d 78, 80–81 (2d Cir.2007). Although the present case involves the transit of passengers and not goods, a similar rationale applies because this area of law is also governed by international convention and involves similar modalities of contracting and transport. In any event, the choice of law presents little difficulty as New York and federal law on choice of law do not conflict. Under both federal common law and New York state choice of law rules, the court applies an interest analysis. *Id.* at 81 (citing *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350 (2d Cir.1992)); *Vumbaca v. Terminal One Group Ass'n L.P.*, 859 F.Supp.2d 343, 360–61 (E.D.N.Y.2012).

An interest analysis suggests two options for the law governing the contract, neither of which is New York law. The parties' contract was made over the internet. (R & R at 305–06.) Performance was to begin in the United States, specifically, Newark, New Jersey. Arguably, New Jersey law applies because the flight would have originated from that state. In that case, the Conditions of Carriage would be governed by New Jersey law, except as preempted by U.S. federal law, including the ADA. Another obvious candidate is the law of England and Wales, and through it, that of the European Union. The Community Regulation applies to passengers departing a non-member state when the airline is an EU carrier. Council Regulation 261/2004, art. 3, 2004 O.J. (L46) 1, 3(EC). It is mandatory and cannot be contracted around. Council Regulation 261/2004, art. 15.1, 2004 O.J. (L46) 1, 6(EC). Second Circuit precedent directs the court to the Restatement of Conflicts of Laws. *Eli Lilly*, 502 F.3d at 81. The

---

1. This regulation is referred to in the papers as EU Regulation 261. It is actually a European Community regulation, enacted before the 2009 Treaty of Lisbon under which the European Community was absorbed into the EU.

Restatement suggests that the law of the place of departure, New Jersey, would apply to the contract. *Rest.2d Confl.* § 197.

The court need not resolve this question today because it does not affect the outcome of the case, or the correctness of the Magistrate Judge's ultimate determination. Even if New Jersey law would require that the regulation be incorporated by reference, or if the law of England and Wales applied to this contract, Regulation 261/2004 would be inapplicable here.

Plaintiffs cannot recover under Regulation 261/2004 because the text of the regulation states that airlines need not provide compensation in the case of: "extraordinary circumstances which could not have been avoided even if all reasonable measures had been taken." Council Regulation 261/2004, art. 5.3, 2004 O.J. (L46) 1, 4(EC). The European Court of Justice, the highest court of EU law,[2] has ruled that such circumstances include "an event which is not inherent in the normal exercise of the activity of the carrier concerned and is beyond the actual control of that carrier on account of its nature or origin." Case C–549/07, *Wallentin—Hermann v. Alitalia— Linee Aeree Italiane SpA.*, 2008 E.C.R. I–1106; *see also* Case C–12/11, Judgment of the Court (Third Chamber) *McDonagh v. Ryanair Ltd.*, Jan. 31, 2013, *available at* http://curia.europa.eu.

A snow-related cancellation is clearly beyond an airline's actual control and thus is an extraordinary circumstance, unlike, for instance, a controllable mechanical failure. *See* Case C–12/11, McDonagh, ¶ 29. Because the cancellation was an extraordinary circumstance under the terms of Regulation 261/2004, Defendant is not obligated to compensate Plaintiffs under the Regulation. As discussed above, Plaintiffs dispute the fact that snow caused their flight to be cancelled, but offer no evidence to back up this assertion. Because the court adopts the view that extraordinary circumstances prevented Plaintiffs from taking their original flight, it need not treat the question of whether they would need to exhaust administrative remedies. (*See* R & R at 313); *but see* Case C–12/11, McDonagh, ¶ 22 (existence of administrative process does not affect standing to sue carrier under the regulation).

Regardless of whether Regulation 261/2004 applies, Plaintiffs would not be entitled to compensation. The court adopts the Magistrate Judge's recommendation that a snowstorm presents an "extraordinary circumstance" excusing Defendant from liability under terms of the Regulation. (R & R at 313.)

### 4. *Application of the Montreal Convention*

■ Finally, Plaintiffs object to the application of the Montreal Convention. They object both to the characterization of the incident as an accident and to Magis-

---

**2.** The court was concerned to see that Plaintiffs submitted the opinion of Advocate General Bot, and not the judgment of the court, in the *McDonagh* case. The advocate general is a position that derives from the French legal system, and has no close analogue in our own. He or she represents neither of the parties, but instead provides an independent opinion to the court. Sometimes, the court's holding will adopt an advocate general's opinion explicitly; sometimes, it is implicitly understood that the opinion is guiding the court's reasoning; and sometimes the European Court of Justice and the advocate general will disagree. Thus, although the opinion of an advocate general can be valuable in interpreting a court judgment, it is not equivalent to one. If submitted to this court as evidence of EU law, it should be accompanied by the judgment of the court. *See* Michel Bobak, *A Fourth on the Court: Why are There Advocates–General on the European Court of Justice?*, 14 Cambridge Y.B. of Eur. Legal Stud. 529 (2011) (explaining the history and current form of the advocate general).

trate Judge Reyes's determination that Mrs. Kruger was embarking on the aircraft when the incident that led to her being refused carriage and arrested, occurred. These findings trigger the application of the Montreal Convention. Convention for the Unification of Certain Rules for International Carriage by Air ("Montreal Convention"), May 28, 1999, 2242 U.N.T.S. 309, S. Treaty Doc. No. 106–45. The Montreal Convention applies to personal injuries involving international flights. For the Montreal Convention to apply, an accident must take place on the airplane or in the course of embarking or disembarking. Montreal Convention, art. 17.1. This portion of the treaty is identical to its predecessor, the Warsaw Convention, and precedents discussing this article of the Warsaw Convention are generally also applicable to the Montreal Convention. *Weiss v. El Al Isr. Airlines*, 433 F.Supp.2d 361, 365 (2006), *aff'd*, 309 Fed. Appx. 483 (2009), *cert. denied*, 557 U.S. 904, 129 S.Ct. 2797, 174 L.Ed.2d 292, *reh'g denied*, 557 U.S. 958, 130 S.Ct. 32, 174 L.Ed.2d 619. If applicable, the Convention would preempt any state law claims. *Vumbaca*, 859 F.Supp.2d at 364.

Plaintiffs' claims regarding the meaning of accident and embarkation both fail. The Convention applies to the tort claims arising out of Mrs. Kruger's arrest. Because these claims related to harm that is purely mental in nature, Plaintiffs cannot recover under the terms of the Convention.

### a. Defining Accident

The Supreme Court has defined "accident" under the Convention as "an unexpected or unusual event or happening that is external to the passenger." *Air Fr. v. Saks*, 470 U.S. 392, 405, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). The definition "should be flexibly applied after assess-

ment of all the circumstances surrounding a passenger's injuries." *Id.*

Plaintiffs assert that the details of the incident with Ms. Skinner, the flight attendant, are contested. (Pl. Obj. to R & R at 21.) That the facts of the incident may be contested is neither here nor there. The proper question is whether the incident may be characterized as an "accident" under the Montreal Convention. Plaintiffs also point out that nothing on the London to Delhi flight constituted an accident. (*Id.*) This point is both correct and irrelevant, as all parties agree that the incident leading to Mrs. Kruger's arrest happened later. Mrs. Kruger's arrest as she was about to board her next flight was certainly an "unexpected and unusual event" and something courts have fairly characterized as an accident. *E.g., Shen v. Japan Airlines*, 918 F.Supp. 686, 688 (S.D.N.Y.1994) (plaintiff's false imprisonment is Warsaw Convention accident), *aff'd* 43 F.3d 1459.

### b. The Location of the Accident

The other component of personal liability under the Montreal Convention is the location of the accident. The Magistrate Judge recommended that the court hold that Mrs. Kruger was embarking the aircraft at the time of her arrest. Plaintiffs contest this determination, claiming that Mrs. Kruger was not in the process of embarking the aircraft within the meaning of the Montreal Convention. (Pl. Obj. to R & R at 15.)

The Second Circuit uses a four-prong test to determine whether a passenger was embarking on the aircraft within the meaning of the Montreal Convention: (1) the activity of the passengers, (2) restrictions on the passengers' movement, (3) imminence of actual boarding, (4) proximity of passengers to the gate. *Buonocore v. Trans World Airlines, Inc.*, 900 F.2d 8, 10 (2d Cir.1990); *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 33–34

(2d Cir.1975), *cert. denied sub nom., Trans World Airlines, Inc. v. Day,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), *reh'g denied,* 429 U.S. 1124, 97 S.Ct. 1162, 51 L.Ed.2d 574 (1977).

### i. *Activity of the Passengers*

The fact the Plaintiffs were embarking on another flight with the same airline distinguishes this case from those in which the plaintiff was flying with another airline or disembarking at his final destination. *See Rabinowitz v. Scandinavian Airlines,* 741 F.Supp. 441, 445 (S.D.N.Y.1990) (citing *Curran v. Aer Lingus,* 41 Avi. Cas. (CCH) ¶ 17,560 (S.D.N.Y.1982), for the proposition that merely directing passengers to Customs is not disembarkation). Plaintiffs went to Defendant's transfer desk and relied on Defendant's employee, who had their passports and boarding passes, to take them to their gate. *See Buonocore,* 900 F.2d at 10 (passenger at snack shop is not embarking).

### ii. *Restrictions on Movement*

A layover can sometimes allow passengers relatively unrestricted movement, but that is not the case here. Unlike the plaintiff in *Hunter,* the example given by Plaintiffs, the Krugers did not have a layover of several hours. *Hunter v. Deutsche Lufthansa AG,* 863 F.Supp.2d 190, 207 (E.D.N.Y.2012) (arrest that resulted from a miscommunication during a two-hour layover is not in the course of embarking or disembarking); *see also Rabinowitz,* 741 F.Supp. at 446. They rushed to the line to board their plane, which was about to take off. These Plaintiffs were in a position similar to the plaintiff in *Jefferies* who was injured on her way to Gate 22 at Heathrow Airport. Jefferies was "located twelve feet from the gate room of Gate 22" at Heathrow, which was "remotely located at the end of terminal." *Jefferies v. Trans World Airlines, Inc.,* 85–C–9899, 1987 WL 8168, at *4 (N.D.Ill. Mar. 17, 1987). The Northern District of Illinois found Jefferies's position close enough to warrant airline liability for her injury because her movement was restricted by her need to make her flight. Plaintiffs' movements were as, if not more, restricted. Plaintiffs state that: "On several occasions inside the terminal ... they were stopped, and Virgin staff took their passports and tickets, immobilizing them ...." (Second Am. Compl. ¶ 48.) Also like Jefferies, Plaintiffs were "not in a public area. [They were] in the area that was restricted to departing passengers." *Id.* Finally, like Jefferies, Plaintiffs were not free to go where they wanted in the terminal without missing their flight. *Id.* Although they state that this action took place in "the public, general terminal," (*id.*) they were under the airline's control for significant portions of their journey to the gate, as well as while in waiting to cross the glass partition separating them from the gate.

### iii. *Imminence of Boarding*

Again, the imminence of boarding distinguishes the case from *Hunter.* The flight was boarding when Plaintiffs arrived at the gate. That Mrs. Kruger was denied boarding does not affect the imminence of boarding. *See Marotte v. Am. Airlines, Inc.,* 296 F.3d 1255, 1261 (11th Cir.2002) (flight attendant allegedly slammed door as plaintiffs attempted to pass through); *Matveychuk v. Deutsche Lufthansa, AG,* 2010 WL 3540921, at *3 (E.D.N.Y. Sept. 7, 2010) (plaintiff denied permission to board connecting flight); *Rajcooar v. Air India Ltd.,* 89 F.Supp.2d 324 (E.D.N.Y.2000) (passenger suffered a heart attack while in line to board).

### iv. *Proximity to the Gate*

Their proximity to the gate also favors a finding that Plaintiffs were embarking. Although the alleged torts continued farther from the gate, the key issue in this

case concerns the actions that Defendant's employees took to effectuate Mrs. Kruger's arrest. Other district courts in New York have so held when passengers were detained, even at some distance from the airport. *See Shen*, 918 F.Supp. at 688 (plaintiff alleged detention in hotel by airline employees because they believed that he did not have the appropriate entry visa); *Singh v. N. Am. Airlines*, 426 F.Supp.2d 38 (E.D.N.Y.2006) (plaintiff wrongfully detained when airline employee used his luggage tag to smuggle drugs); *see also id.* 47–48 (contrasting that case with *Schroeder v. Lufthansa*, 875 F.2d 613 (7th Cir.1989) in which passenger did not allege that wrongdoing on the part of the airline led to her detention).

Mrs. Kruger was not at Gate 22 when the initial allegedly false report was made to police. (Def. 56.1 Stmt. ¶ 61.) But, as the R & R notes, Mrs. Kruger was at or near the gate when Ms. Skinner spoke with the police and when Mrs. Kruger was arrested. (R & R at 321.) Although she might have been tripped by a flight attendant while disembarking her previous flight, Mrs. Kruger complains only of torts arising from her arrest and detention. Since the check in desk for Gate 22 is the place in which alleged misconduct by the airline led to her arrest, proximity to the gate also weighs in favor of a finding that Mrs. Kruger was in the process of embarking for Montreal Convention purposes.

Having reviewed the issues de novo, the court adopts the Magistrate Judge's recommendation that it apply the Montreal Convention. Mrs. Kruger encountered an unexpected and unusual event that falls within the definition of Montreal Convention accident. The circumstances of this case also favor a finding that the Krugers were in the process of embarking under the Second Circuit's test. Plaintiffs made their way directly to Gate 22. To reach Gate 22, they went to the end of a dead-end corridor. There, they got in line to enter a special glass-enclosed area at the entrance to the Gate. Mrs. Kruger was waiting to board when she was arrested. There were severe restrictions on her movement, both because airline personnel had possession of her passport and boarding pass for part of the time and because she was trying to catch a flight that was about to leave. And she was arrested at the check in desk to the area around the Gate.

### c. Plaintiffs' Injuries

■ Because the Montreal Convention governs the instant case, and the Convention preempts state law claims, it is the only source of liability for Defendant. *See El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). To recover under the Montreal Convention, a claimant has to have sustained death or bodily injury. Montreal Convention, art. 17. Courts in the United States, and abroad, have consistently read the Convention to preclude recovery for purely psychic injuries. *See E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) (drafting history of the Warsaw Convention and subsequent interpretation by the courts of various parties favors a narrow reading of "bodily injury."). Bodily injury can include "a change in the structure of an organ" *Id.* at 541, 111 S.Ct. 1489. Recovery for mental injuries is limited to situations in which the mental injuries resulted from a physical injury to the plaintiff. *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366 (2d Cir.2004).

Two of the Plaintiffs, Mr. and Mrs. Kruger, claim damages stemming from Mrs. Kruger's arrest. Mrs. Kruger alleges she felt "shock, express[ed] fear, and [became] traumatized." (2d Am. Compl. ¶ 43.) "She was humiliated and forever

mentally scarred." (*Id.*) She has incurred expenses for psychiatric treatment and "continues to have nightmares and fear, anxiety panic attacks, and has been adversely and materially affected mentally" by Defendant's acts. (*Id.*) These types of injuries, standing alone, are not recoverable under the Convention.

■ Mrs. Kruger also asserts that she suffers from Post–Traumatic Stress Disorder (PTSD) and that PTSD can cause physical changes to the brain's structure, meeting the bodily injury standard. (Pl. Obj. to R & R at 24.) Although willing to entertain the possibility that this might be so in some cases, the Magistrate Judge correctly noted the paucity of evidence of physical injury in this case. (R & R at 323–24); *see Turturro v. Cont'l Airlines*, 128 F.Supp.2d 170, 179 (S.D.N.Y.2001) ("the case at bar parallels others in which plaintiffs have not advanced with the requisite specificity either a brain-lesion theory of PTSD or individualized proof of such lesions.").

Plaintiffs assert in their Rule 56.1 Statement that "the frontal lobes of [Mrs. Kruger's] brain are believed to be swollen and enlarged as is the case with PTSD." (Pl. Rule 56.1 Res. ¶ 111). However they do not adduce any evidence of this swelling, nor do they explain the basis for this belief. Plaintiffs now claim that, at trial, they would have introduced "brain scans" of Mrs. Kruger that they seemingly do not currently have. (Pl. Obj. to R & R at 24.) That response is not adequate given the posture of this litigation. The court is deciding motions for summary judgment, not motions to dismiss arising before Plaintiffs have had much chance to investigate. Plaintiffs first filed this action in June 2011. (Compl.) Discovery in this case closed a year ago. (*See* Minute Entry, Sept. 28, 2012.) Plaintiffs cannot now return to the court with vague statements

that they might, at some unspecified future time, offer some future evidence that they vaguely refer to as "brain scans." *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The issues they raise are not material because, they are not supported by any admissible evidence. *Id.* Given the evidence properly before it, the court agrees with the Magistrate Judge that Mrs. Kruger's injuries were purely mental and therefor, not recoverable under the Montreal Convention.

Mr. Kruger's claim for loss of consortium must also fail. Under Article 17 of the Montreal Convention, loss of consortium claims may be brought according to the domestic law of the contracting states. *Zicherman v. Kor. Air Lines, Co. Ltd.*, 516 U.S. 217, 225, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). Because the underlying torts occurred in England, under an interest analysis, English law should be applied if it would differ from New York law. (R & R at 325 n. 18.) However, both English and New York law treat loss of consortium as a derivative claim. (*Id.*); *Argento v. Airborne Freight Corp.*, 933 F.Supp. 373, 377 (1996). As a result, Mr. Kruger's loss of consortium claim cannot survive summary judgment rejecting his wife's claims.

### 5. *Remaining Questions*

The court admits to some confusion over the final pages of Plaintiffs' Objections. (Pl. Obj. to R & R at 25–26.) Plaintiffs seem to be trying to make a general point that if this court, or a court of appeal, decides that the Montreal Convention does not apply to this case, Plaintiffs would have claims in tort and their motion for partial summary would again be relevant. (*Id.*) That observation is not a specific objection to any part of the R & R.

Finally, Plaintiffs seem to be under the impression that they are going to able to add a defamation claim, which they did not specifically plead and which was not

brought before the Magistrate. (*Id.*) They state that they would move under Rule 15 to amend their pleadings at trial and that Defendant should have been aware of this. (*Id.* at 26.) As discussed above, Plaintiffs cannot use their objections to add a claim that was not properly before the Magistrate Judge. *Haynes*, 2003 WL 23610575, at *3. This type of ambush defeats the goals of the Magistrate Judge's statute—it promotes neither fairness, nor the efficient use of court time. *Cf. Paterson–Leitch Co.*, 840 F.2d at 995. Characterizing a letter that Mr. and Mrs. Kruger received from Defendant as "defamatory" does not amount to proper notice to the Magistrate Judge and opposing party. (*See* Second Am. Compl. ¶ 48.) Defamation requires that the false statement be made to third parties and that it damage the subject's reputation. *Black's Law Dictionary* (9th ed.2009). Plaintiff's allegations of publicity and damage to reputation are conclusory, as they never state who the letter was published to and what the damage to Mrs. Kruger's reputation was. *See* Fed. R.Civ.P. 8(a)(2)-(3); (*see generally* Second Am. Compl.) Thus it is improper for the court to sustain such a claim as an objection the R & R.

## IV. CONCLUSION

The court has reviewed de novo portions of the R & R subject to Plaintiff's objections. It has reviewed all other aspects of the R & R for clear error. With appropriate modification to the reasoning, the court ADOPTS the Magistrate Judge's recommendation that Defendant's motion for summary judgment be granted in its entirety. It further ADOPTS the Magistrate Judge's recommendation that Plaintiffs' motion for partial summary judgment should be denied because the grant of

Defendant's motion has rendered it moot. Defendant's motion to amend its reply to objections is GRANTED. Defendant's motion for summary judgment is GRANTED. Plaintiffs' motion for partial summary judgment is DISMISSED AS MOOT.

SO ORDERED.

## *REPORT & RECOMMENDATION*

RAMON E. REYES, JR., United States Magistrate Judge.

Lynne Kruger ("Mrs. Kruger"), Sheldon Kruger ("Mr. Kruger"), Maxwell Kruger, and Lawson Kruger (collectively, "Plaintiffs") filed this action alleging breach of contract, false arrest, malicious prosecution, intentional infliction of emotional distress, negligence, and loss of consortium against Virgin Atlantic Airways, Limited ("VAA"). Before the Court are VAA's motion for summary judgment and Plaintiffs' motion for summary judgment as to certain of VAA's affirmative defenses. Your Honor has referred both motions to me for a report and recommendation. For the reasons set forth below, I respectfully recommend that VAA's motion be granted, and that Plaintiffs' motion be denied.

## *BACKGROUND*

### I. *Facts*[1]

On August 22, 2010, Plaintiffs purchased four round-trip tickets to travel on VAA flights from Newark, New Jersey to Delhi, India with a lay-over at Heathrow Airport in London, England ("Heathrow"). (Defendant Virgin Atlantic Airways, Ltd.'s Rule 56.1 Statement in Support of Motion for Summary Judgment ("Def.'s 56.1 Stmt."), Dkt. No. 42, Exh. 2, ¶ 1; Second Amended Compl. ("Compl." or "Com-

---

1. Unless indicated otherwise, all facts are undisputed. *See also infra.*, Discussion I.A (re-

garding deficiencies in Plaintiffs' 56.1 statement and certain facts deemed undisputed).

plaint"), Dkt. No. 23, ¶¶ 1–2.) All four tickets were non-refundable and were subject to VAA's Conditions of Carriage ("Conditions of Carriage"). (Compl., Exh. A ("e-tickets").) The departure flight from Newark was originally scheduled for December 23, 2010. (Def.'s 56.1 Stmt. ¶ 2.) On December 21, 2010, Plaintiffs were informed via email that their flight from Newark to Heathrow had been cancelled due to "on-going restrictions on the runway at [Heathrow]." (Id. at ¶ 4.) The runway restrictions, which forced cancellation of other VAA flights, were caused by heavy snow and adverse weather conditions in London. (Id. at ¶¶ 5–6.) Despite their efforts, Plaintiffs did not book another VAA flight to London that would have allowed for connection to their flight to Delhi. (Id. at ¶¶ 7, 9.) Instead, Plaintiffs booked flights to Jamaica and then to Gatwick Airport in England with a different air carrier. (Id. at ¶ 9; Declaration of Christopher Carlsen in Support of Motion for Summary Judgment ("Carlsen Decl."), Exh. 8–9 to Dkt. No. 42, Exh. B, Deposition of Sheldon Kruger ("S. Kruger Dep."), 11:1–13:14.) Plaintiffs then used their existing VAA tickets to fly from Heathrow to Delhi, India. (Def.'s 56.1 Stmt. ¶ 9.)

On January 9, 2010, Plaintiffs traveled on their original return flight from Delhi to Heathrow on VAA Flight No. 301. (Def.'s 56.1 Stmt. ¶ 10; Plaintiffs' Rule 56.1 Statement in Support of Partial Motion for Summary Judgment ("Pls.' 56.1 Stmt."), Dkt. No. 47, ¶ 1.) Flight 301 arrived late into Heathrow because it was delayed during take-off in Delhi. (Def.'s 56.1 Stmt. ¶ 18; Pls.' 56.1 Stmt. ¶ 1.) Plaintiffs were scheduled to board a connecting flight, VAA Flight No. 17, to Newark at Gate 22 in Terminal in Heathrow. (Def.'s 56.1 Stmt. ¶¶ 11–12.) A number of passengers on Flight 301 were scheduled to make the same connecting flight. (Id. at ¶ 18.) Upon landing in Heathrow, a door in the middle of the aircraft, referred to as the L2 door, was used by the crew and passengers for disembarkation. (Id. at ¶ 16.) The "upper class" seating was located between the L2 door and the front of the plane, and the "economy" and "premium economy" seating sections were located between the L2 door and the rear of the plane. (Id.) Mrs. Kruger was seated in row 38 of the economy section, located between the L2 door and the rear of the plane but also behind the "premium economy" section. (Id. at ¶ 21.) Leanne Skinner ("Skinner") was working as a flight attendant on Flight 301 that day, and was assigned in part to instruct passengers seated in the premium economy and economy sections of the aircraft using L2 door for disembarkation not to exit until the upper class passengers also using the L2 door had all left the plane. (Id. at ¶¶ 13, 16–17.)

When disembarkation began, Mrs. Kruger was the first passenger from the economy and premium economy sections to the rear of the L2 door waiting in line to exit from that door. (Id. at ¶ 25–26.) Mrs. Kruger asked Skinner if she could deplane before the upper class passengers because she wanted to make her connecting flight. (Id. at ¶ 26.) Mrs. Kruger also asked Skinner for her name. (Pls.' 56.1 Stmt. ¶ 2.) Skinner told Mrs. Kruger that she could not disembark before the upper class passengers had finished deplaning and that she would have to wait. (Def.'s 56.1 Stmt. ¶ 29.) Mrs. Kruger appeared "irritated and annoyed" that she had to wait to exit the plane and asked at least three times if she could pass. (Id. at ¶ 30; Pls.' 56.1 Stmt. ¶ 2.) After the upper class passengers deplaned, Skinner moved into a position adjacent to the L2 door in order to allow the waiting passengers to disembark, beginning with Mrs. Kruger. (Def.'s 56.1 Stmt. ¶ 31; Pls.' 56.1 Stmt. ¶ 1.) As

Mrs. Kruger was exiting the aircraft, she walked past Skinner and her shoulder made physical contact with Skinner's chest. (Def.'s 56.1 Stmt. ¶¶ 32–35; Pls.' 56.1 Stmt. ¶ 3.) Skinner claims to have experienced pain as a result of the contact with Mrs. Kruger and took a seat on the aircraft while the rest of the passengers deplaned. (Def.'s 56.1 Stmt. ¶¶ 39–40.) The captain of the aircraft then called the police about the incident upon Skinner's request. (Pls.' 56.1 Stmt. ¶ 21; Defendant's Rule 56.1 Statement in Response to Plaintiff's Rule 56.1 Statement ("Def.'s 56.1 Resp."), Dkt. No. 45, ¶ 21.)

Skinner and VAA maintain that Mrs. Kruger intentionally "barged" into Skinner and called her a "bitch." (Def.'s 56.1 Stmt. ¶ 33.) Plaintiffs disagree and contend that Mrs. Kruger fell because she was intentionally tripped by Skinner. (Pls.' 56.1 Stmt. ¶ 3; Compl. ¶ 11.) In response, Defendants note that Mrs. Kruger's deposition testimony does not wholly support this contention because at her deposition she testified, "I don't know that it was the flight attendant that tripped me. But what I know is that when I stumbled, I saw a blue flight attendant shoe." (Def.'s 56.1 Resp. ¶ 3 citing Carlsen Decl., Exh. C, Deposition of Lynne Kruger ("L. Kruger Dep."), 49:11–17.)

After the incident, the Krugers headed towards Gate 22 to board their connecting flight to Newark. (Def.'s 56.1 Stmt. ¶ 61.) Along the way, Mr. and Mrs. Kruger were stopped by VAA staff at a counter and handed over their passports and boarding passes as they walked through the terminal. (S. Kruger Dep., 33:1–17; L. Kruger Dep., 66:16–18.) When the Krugers approached Gate 22, they were stopped by VAA staff and informed that Mrs. Kruger could not board the aircraft because the police wanted to question her about the incident with Skinner. (Def.'s 56.1 Stmt.

¶ 67; Pls.' 56.1 Resp. ¶ 64.) Skinner had also walked to Gate 22 and was there when the Krugers arrived. (Def.'s 56.1 Stmt. at ¶¶ 42–43.) VAA employee Paul Brunning ("Brunning") informed the Krugers that Mr. Kruger and his two sons, Maxwell and Lawson, could board Flight 17. (Id. at ¶ 82.) The police questioned both Mrs. Kruger and Skinner about the incident. (Def.'s 56.1 Stmt. ¶ 71; Pls.' 56.1 Resp. ¶ 43.) Mrs. Kruger was then informed by the police that she was to be questioned further at the police station, and was arrested and driven to the police station. (Def.'s 56.1 Stmt. ¶¶ 72, 75–76.) She was not placed in handcuffs or physically restrained by the police. (Id. at ¶ 76.)

Mr. Kruger chose not to board Flight 17 because he felt that he could not leave England without his wife. (Id. at ¶¶ 82–84; Pls.' 56.1 Resp. ¶ 83.) The Krugers' sons boarded Flight 17 and returned to Newark. (Id. at ¶ 87.) All four of the Kruger family's bags were checked under Mr. Kruger's name on the flight from Delhi and were off-loaded from Flight 17 because Mr. Kruger was not returning to Newark at that time. (Id. at ¶¶ 88–89.) VAA then refunded the cost of Sheldon Kruger's ticket in the amount of $400.06. (Def.'s 56.1 Stmt. ¶ 85; S. Kruger Dep., 76:16–22.) The police drove both Mr. and Mrs. Kruger to the police station in a police van. (Id. at ¶ 93.) Mr. Kruger went to a nearby hotel while Mrs. Kruger was questioned by the police. (Id. at ¶ 95.) Mrs. Kruger was questioned by the police and then released. (Id. at ¶ 94.) Mrs. Kruger was not charged with any crime. (Id. at ¶ 96; Carlsen Decl., Exh. E, London Police Report at pp. 8–9, 13–14.)

Mr. and Mrs. Kruger flew back to United States on a British Airways flight later that day. (Id. at ¶ 104.) After the incident, Mrs. Kruger received a letter from VAA banning her from any future travel

with the airline. (Pls.' 56.1 Stmt. ¶ 5.) On April 12, 2012, Plaintiffs were refunded the cost of their cancelled December 23, 2010 flight from Newark to Heathrow in the amount of $1,414.20. (Def.'s 56.1 Stmt. ¶ 8.)

## II. *Procedural History*

Plaintiffs filed this action on June 20, 2011 against VAA, Jane Doe. No. 1, later identified as Skinner, Brunning, and VAA employee Andrew Blackwell. (Dkt. No. 1.) Plaintiffs subsequently amended their complaint and dropped all claims against the individual defendants, thereby leaving VAA as the sole defendant. (Dkt. No. 3.) On June 14, 2012, Plaintiffs filed a second amended complaint against VAA. (Dkt. No. 23.) Following discovery, the parties' motions were filed on January 4, 2013(VAA) and January 11, 2013 (Plaintiffs), respectively. (Dkt. Nos. 42, 43.)

## DISCUSSION

### I. *Legal Standard for Summary Judgment*

The standard for summary judgment is well established. The party moving for summary judgment has the burden to demonstrate that (1) "there is no genuine dispute as to any material fact" and (2) "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to a material fact is one that "might affect the outcome of the suit under the governing law" and that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether summary judgment is warranted, "[t]he Court 'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (quoting *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996)). The moving party bears the burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Conclusory allegations or "some metaphysical doubt as to the material facts" fail to create such issue. *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) (citations and internal quotation marks omitted). The nonmovant cannot create a genuine dispute of material fact by "rely[ing] on the allegations in his or her pleadings, conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Cushing v. Morning Pride, Mfg., L.L.C.,* 05–CV–3612 (DRH), 2008 WL 283772, at *10 (E.D.N.Y. Jan. 30, 2008) (citation and internal quotation marks omitted).

### A. *Local Rule 56.1*

Under Local Civil Rule 56.1, the moving party must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civil Rule 56.1(b). The nonmoving party's opposition must "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." *Id.*

Typically, one party's "failure to respond or contest the facts set forth by the [movant] in [its] Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Pooler v. Hempstead Police Dept.,* 897 F.Supp.2d 12, 17 n. 7

(E.D.N.Y. Sept. 14, 2012) (quoting *Jessamy v. City of New Rochelle*, 292 F.Supp.2d 498, 504 (S.D.N.Y.2003)). Plaintiffs' Rule 56.1 Statement in response to VAA's motion regularly relies on speculation, mere denials, and conclusory allegations without proper citation to any evidence whatsoever. Such responses are inadequate. Fed. R.Civ.P. 56(e); *see also Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir.2001) ("[M]ere speculation and conjecture [are] insufficient to preclude the granting of the motion"); *Nat'l Westminster Bank USA v. Ross*, 676 F.Supp. 48, 51 (S.D.N.Y.1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact"). Furthermore, Plaintiffs make legal arguments in their Rule 56.1 Statement that should appear only in their memorandum of law. Accordingly, the Court will deem the facts admitted where Plaintiffs' responsive 56.1 statements are either legal argument or conclusory denials unsupported by evidence. However, where disputed material facts are supported by citations to evidence, the Court will address the disputes to the extent that they are relevant to the competing motions.

## B. *"Sham Affidavits"*

Plaintiffs argue that the "sham affidavits" submitted by VAA in support of their motion for summary judgment, and the 56.1 statements based thereon, should be disregarded pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure because the declarants were "never identified as [witnesses] pursuant to legitimate request in Plaintiffs' interrogatories." (Pls.' Opp. at 6.) Plaintiffs also argue that Skinner's declaration should be disregarded because it was inconsistent with her deposition testimony. (*Id.*) VAA argues that the declarations are proper because it advised Plaintiffs of all individuals with relevant knowledge under Rule 26, and that Plaintiffs deposed all of those individuals with the exception of Debra Messinger. (Defendant's Reply in Support of Motion for Summary Judgment ("Def.'s Reply"), Dkt. No. 42, at 1.)

Although Plaintiffs cite no case law regarding the "sham affidavit" principle, "[i]t is well settled in [the Second Circuit] that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124–25 (2d Cir.1987) (citing *Perma R & D Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)). The rule is meant to prevent a party from creating post hoc a triable issue of fact, thus defeating a motion for summary judgment. *Id.* The "sham affidavit" principle is not absolute and will not bar an affidavit when "an issue was not fully explored in the deposition, or the deponents responses were ambiguous." *Giliani v. GNOC Corp.*, 04–CV–2935 (ILG), 2006 WL 1120602, at *3 (E.D.N.Y. Apr. 26, 2006) (citing *Palazzo v. Corio*, 232 F.3d 38, 43 (2d Cir.2000)). Further, "where a party's conflicting affidavit statements are corroborated by other evidence, the affidavit may be admissible, since the concern that the affidavit is a 'sham' is alleviated." *Id.*

With these principles in mind, I conclude that VAA's declarations will not be excluded from consideration. Plaintiffs make little or no effort to show how the declarations are inconsistent with deposition testimony or other evidence. Instead, Plaintiffs rely mostly on conclusory, unsubstantiated claims that the declarations are "sham affidavits." (*See, e.g.*, Pls.' 56.1 Resp. ¶ 6. ("Never produced in response to discovery request but produced here ... obvious sham affidavit which the Courts regularly reject"); Pls.' 56.1 Resp. ¶ 25

("... Supposition and sham. As to supposition, inadmissable").) Furthermore, the fact that a declarations address an issue outside the scope of deposition testimony does not render it inadmissable. *See Palazzo*, 232 F.3d at 43 ("sham affidavit" rule does not bar declarations regarding an issue not fully explored in the deposition). Accordingly, the declarations will be considered to the extent that Plaintiffs have failed to show that they contradict prior deposition testimony. Where there are actual contradictions between the declarations and deposition testimony, I will exclude those statements from consideration.

## II. *VAA Is Entitled to Summary Judgment on Plaintiffs' Breach of Contract Claims*

### A. *The Outbound Flight (Count One)*

Plaintiffs allege that VAA's failure to provide alternative carriage to London on the day of their outbound flight breached VAA's obligations under the Conditions of Carriage and under European Union Regulation 261 ("EU 261"). (Compl. ¶ 31.)[2] Specifically, Plaintiffs argue that VAA breached Article 9.3.1.1 of the Conditions of Carriage when it failed to arrange alternative carriage to London so that Plaintiffs could make their connecting flight to India. (*Id.* at ¶¶ 31–33; Pls.' Opp. 25–27.) As such, Plaintiffs contend that they are entitled to cover damages representing the cost of the alternative carriage to London they arranged on a different carrier. (*Id.*) Plaintiffs also argue that they are entitled to remedial penalties under EU 261 because VAA did not comply with the requirements of the statute. (*Id.*)

### i. *Plaintiffs' Claims under the Conditions of Carriage*

In the event that VAA cancels a flight, Article 9.3.1.1 of the Conditions of Carriage allows the customer to choose one of three available remedies, only one of which is relevant to the instant motion:

> 9.3.1.1(b) Remedy Two—[VAA] will reroute you to your final destination airport (or another nearby destination agreed between us) [1] *on our earliest flight with suitable space available* in the ticket class of service for which you have paid the fare, or [2] *at our option in comparable transport conditions.*

(Conditions of Carriage, art. 9.3.1.1(b) (emphasis added).)[3] Under this second option, the customer is re-routed on the earliest VAA flight where there is space

---

2. When suit was commenced, Plaintiffs also argued that VAA's failure to refund the purchase price of that leg of the journey also constituted breach of the Conditions of Carriage. (Dkt. No. 1, ¶ 26.) There is no dispute, however, that on April 12, 2012, Plaintiffs were refunded $1,414.20, which is the amount of the purchase price of that part of the trip. (Declaration of Debra Messinger in Support of Motion for Summary Judgment ("Messinger Decl."), Dkt. No. 42, Exh. 7, ¶ 6); (S. Kruger Dep. 76:16–22.) Because Plaintiffs' outbound tickets have been refunded, their claim regarding breach of the Conditions of Carriage only survives to the extent that VAA's failure to provide alternative carriage was in breach of their contractual obligations. Plaintiffs' arguments regarding the sham nature of the Messinger declaration are

rejected, (Pls.' Opp. at 6), as the issue of the refund does not appear to have been explored during discovery. It is thus wholly appropriate for VAA to have submitted the Messinger declaration on summary judgment.

3. The first remedy allows for a refund of the ticket price. (*Id.* at art. 9.3.1.1(a).) As discussed above, the Krugers were refunded their ticket price. (Messinger Decl., ¶ 6.) The third remedy permits the customer to choose to be rerouted to their destination at a later date. (*Id.* at art. 9.3.1.1(c).) That remedy, however, was not practical for, nor requested by, the Plaintiffs because they needed to be in Heathrow in time for their connecting flight to India. (*See* Pls.' Opp. at 27 (indicating that Plaintiffs opted for the second remedy).)

available. (*Id.*) If there is no space available, VAA has the option to re-route the customer in "comparable transport conditions," presumably on another airline. (*Id.*) In sum, the Conditions of Carriage provide that VAA is only obligated to fly a customer on VAA when there is suitable space available, and may, at its option, re-route that customer on another airline.

Plaintiffs argue that they attempted to invoke the second remedy under 9.3.1.1 and that VAA failed to honor their selection, thus breaching the contract. (Pls.' Opp. at 27.) Sheldon Kruger testified at his deposition that when the Krugers' flight to London was cancelled he called VAA. (S. Kruger Dep., 10:1–14.) Mr. Kruger claims that the VAA representative told him to "[f]eel free to make [his] own arrangements to get to London" and that he was "on his own" if he wanted to make other plans. (*Id.*) Mrs. Kruger similarly testified that she heard the VAA representative tell her husband that there was nothing that VAA could do to help them. (L. Kruger Dep., 13:13–20.)

VAA responds with admissible evidence that because of the runway restrictions at Heathrow caused by a snow storm there were no available VAA flights to London on which the Plaintiffs could have traveled that would have allowed them to make their connection. (Def.'s 56.1 Stmt. ¶¶ 5–7.) Alan Wallace, a VAA asset protection manager who investigated Plaintiffs' claims, testified at a deposition and submitted a declaration in support of VAA's summary judgment motion. According to Wallace:

> As a result of heavy snow and adverse weather conditions existing in London on [December 23, 2010] and the several days earlier, the operating capacity of Heathrow Airport was reduced, which

forced Virgin Atlantic and other commercial carriers operating at Heathrow to cancel flights. Of the 20 VAA flights originally scheduled to operate into Heathrow Airport on December 23, 2010, VAA was forced to cancel seven of them as a result of the adverse weather conditions. These cancelled flights included Flight No. VS018 originally scheduled to operate from Newark to Heathrow on that date. Due to the number of weather caused cancellations, and the existing heavy passenger loads during the holiday season (two days before Christmas), VAA was unable to re-book the Krugers on another VAA flight that would have allowed them to make their scheduled connecting flight from Heathrow Airport to Delhi, India.

(Declaration of Allan Wallace in Support of Motion for Summary Judgment, Dkt. No. 42, Exh. 4, ¶ 6); (*see also* Pls.' 56.1 Resp. citing Deposition of Allan Wallace, 194:3–7) ("[t]here were capacity restrictions at Heathrow on that day because of the snow event. So as an airline, we would have been asked to reduce capacity on that day because the airfield could not handle the full operations."). As there were no available VAA flights that would have enabled the Krugers to make their connecting flight in Heathrow, VAA was under no obligation to provide the Plaintiffs alternative carriage to London either on VAA or another airline under Article 9.3.1.1 of the Conditions of Carriage. *See Giuffre v. Delta Air Lines, Inc.*, 10–CV–1462 (DLI)(MDG), 2012 WL 3988981, at *4 (E.D.N.Y. Sept. 11, 2012) ("In determining a party's obligations under a contract, the initial interpretation of a contract is a matter of law for the court to decide.").

Plaintiffs counter that Heathrow was "wide open," that any evidence of snow is not relevant and should be excluded,[4] and

---

4. Plaintiffs relevance argument is another ex- ample of improper legal argument in its 56.1

that "it was Virgin who decided to cancel the flight for some reason, not weather . . ." (Pls.' Opp. at 8; Pls.' 56.1 Resp. ¶ 5.) Plaintiffs, however, cite to no evidence in the record to substantiate their arguments. In this regard, Plaintiffs' Rule 56.1 statements are completely devoid of any admissible evidence whatsoever, and rest on mere conclusory denials of VAA's contentions. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir.2003) ("If the opposing party [ ] fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."). When faced with admissible evidence in support of a motion for summary judgment, the non-moving party cannot rest on mere allegations or denials of the adverse party's contentions, conclusory assertions, or conjecture or speculation. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996); *Gilliard v. City of New York*, No. 10–cv–5187 (NGG)(VLP), 2013 WL 521529, *4 (E.D.N.Y. Feb. 11, 2013). Rather, the party must come forward with "specific facts showing that there is a genuine issue for trial." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir.2008). Plaintiffs have failed to do so.

Because VAA has put forth competent, admissible, and unrebutted evidence that it did not breach the Conditions of Carriage, it is entitled to judgment as a matter of law on Plaintiffs' breach of contract claim (count one).

### ii. *EU 261*

As part of their breach of contract claims, Plaintiffs seek compensation under Article 7 of EU 261 which provides a 600 penalty for passengers whose transatlantic flights are cancelled. (*See* Carlsen Decl., Exh. G, at 5.) Plaintiffs can not, however, recover penalties under EU 261 because such claims are preempted by the Airline

response.

Deregulation Act ("ADA"), 49 U.S.C. §§ 41713 et seq.

The ADA provides that, "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1). Causes of action under state law are preempted by the ADA when (1) a state enacts or enforces a law that (2) relates to airline rates, routes, or services. *Travel All Over the World v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir.1996) (internal quotation marks omitted). Breach of contract claims "seeking recovery solely for [an] airline's alleged breach of its own, self-imposed undertakings" are not preempted by the ADA. *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 228, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995).

Applying the rule in *Wolens*, courts in the Seventh Circuit have held that a plaintiff may bring a claim under EU 261, a law or regulation that would otherwise be preempted by the ADA, only if it is expressly incorporated into the contract. *See Volodarskiy v. Delta Air Lines, Inc.*, No. 11–CV–782, 2012 WL 5342709, at *7 (N.D.Ill. Oct. 29, 2012); *Polinovsky v. Deutsche Lufthansa, AG*, No. 11–CV–780, 2012 WL 1080415, at *3 (N.D.Ill. Mar. 30, 2012); *Giannopoulos v. Iberia Lineas Aereas de Espana, S.A.*, No. 11–CV775, 2011 WL 3166159, at *3 (N.D.Ill. July 27, 2011). Applying the Seventh Circuit's analysis, the Plaintiffs' EU 261 claims are preempted by the ADA because EU 261 is not expressly incorporated or referenced in VAA's Conditions of Carriage.

■ "To incorporate a document by reference, New York law requires that the document be referenced beyond all reasonable doubt." *Serrano v. Cablevision Sys. Corp.*, 863 F.Supp.2d 157, 165 (E.D.N.Y. 2012) (citing *Chiacchia v. Nat'l Westminster Bank USA*, 124 A.D.2d 626, 628, 507 N.Y.S.2d 888 (N.Y.App.Div.1986) (citation omitted)). "When a contract clearly identifies a single document, it eliminates all reasonable doubt and thus qualifies as an effective incorporation." *Id.; see also Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 47 n. 8 (2d Cir.1993). Plaintiffs argue that VAA is bound by EU 261 because VAA has a "Flight Disruption Policy" on its website which provides that the company will abide by the requirements of EU 261. (Pls.' Opp. at 25.) However, Plaintiff's e-tickets expressly state that the incorporated terms of the contract are comprised of the Conditions of Carriage. (*See* Compl., Exh. A.) Those Conditions of Carriage contain no mention of either EU 261 or the "Flight Disruption Policy" appearing on VAA's website. (*Id.*) And unlike the Conditions of Carriage, neither EU 261 or the "Flight Disruption Policy" are incorporated into the contract via the e-ticket. (*See id.*) Therefore, EU 261 is not expressly referenced or incorporated into the contract between Plaintiffs and VAA under New York law and is not enforceable.

Even if EU 261 were incorporated into the Conditions of Carriage, Plaintiffs still cannot recover because the cancellation of their flight was caused by extraordinary circumstances beyond VAA's control. Article 5(3) of EU 261 provides that the cancellation of a flight is not compensable when the airline can "prove that the cancellation is caused by extraordinary circumstances which could not have been avoided even if all reasonable measures had been taken." Case C–12/11, *McDo-*

*nagh v. Ryanair Ltd.*, 2013 O.J. (C 86) 2. The provision is construed narrowly and has been applied by European courts to encompass natural weather events beyond an airlines control, such as the 2010 eruption of the Icelandic volcano Eyjafjallajökull. *Id.; see also* Case C–549/07, *Friederike Wallentin–Hermann v. Alitalia—Linee Aeree Italiane SpA*, 2008 O.J. (C 64) 7 (finding that mechanical failures causing cancellation are not extraordinary circumstances when they are not beyond the airline's actual control). Although the snow storm causing restrictions at Heathrow was not as extreme an event as the 2010 volcanic eruption, it still forced the cancellation of seven flights and is certainly beyond the airline's control. (*See supra*, Discussion II.A.i.)

Finally, even if EU 261 were a part of the contract and the flight's cancellation was not exempted as an extraordinary circumstance, Plaintiffs' claims under the statute still fail because they did not exhaust the administrative remedies available under EU 26 prior to filing suit. *See Dennis v. Central Intelligence Agency*, Nos. 12–CV–4207 (JG), 12–CV–4208 (JG), 12–CV–5334 (JG), 2012 WL 5493377, at *3 (E.D.N.Y. Nov. 13, 2012); *Schwarz v. Dep't of Justice*, 10–CV–0562, 2010 WL 2836322, at *2 (E.D.N.Y. July 14, 2010) (plaintiff's failure to exhaust administrative remedies provides a 'jurisprudential reason' for dismissal).

Article 16 of EU 261 provides, in relevant part, that "... each passenger may complain to any body ... designated by a Member State, about an alleged infringement of this Regulation ..." (Carlsen Decl., Exh. G, at 6–7.) The European Council has promulgated a complaint form with instructions that a claimant should first submit that form to the offending airline and then to an EU enforcement body should the airline not respond. *See*

EU Complaint Form for Air Passengers, http://ec.europa.eu/transport/themes/passengers/air/doc/complain_form/eu_complaint_form_en.pdf Plaintiffs did not do so and have thus failed to exhaust the administrative remedies available to them.

### B. *The Inbound Flight (Count Two)*

Plaintiffs second breach of contract claim seeks additional EU 261 penalties and other damages related to their inbound flight-Heathrow to Newark. (Compl. ¶¶ 34–37.) For the reasons set forth above, VAA is entitled to summary judgment on Plaintiffs' EU 261 claims for the inbound flight because they are preempted by the ADA. *See supra.* Plaintiffs' remaining claims under their second cause of action argue that VAA breached its contract with Plaintiffs because VAA failed to: (1) transport Kruger's sons' luggage to Newark on VAA Flight 17; and (2) provide carriage for Mr. and Mrs. Kruger to Newark or to refund their tickets when the couple did not board VAA Flight 17. (Compl. ¶ 36.) For the following reasons, VAA is entitled to summary judgment on these claims as well.

### i. *Failure to Transport Maxwell and Lawson Kruger's Luggage*

 Plaintiffs claim that VAA breached its contract with Plaintiffs when it did not transport the Krugers' sons' luggage to Newark on VAA Flight 17. (Compl. ¶ 36 ("Defendant breached its contractual obligations ... under its Contract for [VAA Flight 17] by refusing ... to carry the luggage of the Kruger boys ...").) Under New York law, a breach of contract claim requires that a plaintiff show the existence of an agreement, adequate performance, breach of contract by

the defendant, and damages. *Jones v. East Brooklyn Sec. Servs. Corp.*, 2012 WL 3235784, at *6 (E.D.N.Y. Aug. 7, 2012). A breach of contract claim "fails as a matter of law in the absence of any showing that a specific provision of the contract was breached." *Westchester Cnty. Correction Officers Benevolent Ass'n, Inc. v. Cnty. of Westchester*, 99 A.D.3d 998, 953 N.Y.S.2d 623, 625 (2012). Notably, Plaintiffs cite to no specific provision of the Conditions of Carriage which VAA allegedly breached in this regard.

 In response, VAA argues that Article 8.4.2 of the Conditions of Carriage allows the airline to refuse to carry baggage that is reasonably considered unsuitable for carriage for safety reasons. (Def.'s Mem. at 4; Conditions of Carriage art. 8.4.2.) It is undisputed that all four of the Krugers' bags were checked in under Sheldon Kruger's name.[5] (Def.'s 56.1 Stmt. ¶ 88.) VAA argues that it is a "common sense security procedure" followed by "virtually every other air carrier" to not carry baggage checked under a passenger's name who does not board flight. (Def.'s Mem. at 4–5.) Plaintiffs in no way oppose this aspect of VAA's motion for summary judgment or otherwise dispute VAA's argument. Further, Plaintiffs do not argue or provide evidence showing that the Krugers' sons' luggage is not reasonably considered suitable for carriage or checked in under either of the boys' names. As such, I find VAA acted within the terms of the contract, specifically Article 8.4.2 of the Conditions of Carriage, because it did not transport the Krugers' sons' luggage as a legitimate security procedure. Therefore, VAA is entitled to judgment as a matter of law on this claim.

---

**5.** Plaintiffs do contend that "the attendant never asked if the baggage should be checked under a certain name and acted on his or her own." (Pls.' 56.1 Resp. ¶ 88.) In addition to being unsupported by a citation to any evidence, this contention does not belie the fact that the bags were all checked under Sheldon Kruger's name and the fact is thus undisputed. (*See* Def.'s 56.1 Stmt. ¶ 88.)

### ii. *Failure to Refund or Provide Carriage for Lynn and Sheldon Kruger*

Plaintiffs generally allege that "Defendant breached its contractual obligations . . . by failing to refund the Tickets for Sheldon and Lynne Kruger between London and Newark or provide carriage under the Tickets." (Compl. ¶ 36.) Again, Plaintiffs do not point to a specific article of the Conditions of Carriage as a basis for the alleged breach, but rather aver generally to VAA's contractual obligations. In response, VAA argues that it was not contractually bound under various articles of its Conditions of Carriage to refund or provide carriage to either Lynn or Sheldon Kruger. (Def.'s Mem. at 3–4.) Once more, Plaintiffs do not address this defense in their opposition to VAA's motion for summary judgment.

### a. *VAA's Refund Obligations under the Conditions of Carriage*

"In determining a party's obligations under a contract, the initial interpretation of a contract is a matter of law for the court to decide." *Giuffre,* 2012 WL 3988981, at *4. Under Article 10.2.1 of the Conditions of Carriage, passengers are entitled to a refund if they "[1] hold a Confirmed Reservation, [2] have met all applicable check-in deadlines [pursuant to Article 6], and [3] are not precluded from boarding by reason of application of Articles 7.1 or 11.3 or otherwise." (Conditions of Carriage art. 10.2.1.) Article 6.3 requires that a passenger be present at the boarding gate not later than the time specified at check in. (*Id.* at art. 6.3.) Article 7.1 reserves VAA's right to deny a passenger carriage provided that any of a list of events or concerns have occurred, or may reasonably occur, including the commission of a criminal offense or threatening, abusive, or disruptive behavior. (*Id.* at art. 7.1.) Article 11.3 allows the VAA to refuse carriage when a passenger acts in violation of the previous subsections of Article 11. (*Id.* at 11.3.) Article 11.1 maintains that a passenger must not "threaten, abuse or insult other passengers or members of the crew" or "cause distress, discomfort or unnecessary inconvenience to any passenger or crew member." (*Id.* at art. 11.1.3.) In sum, these provisions hold that VAA has no obligation to refund a passenger if that passenger has either (1) failed to properly check in or present itself at the boarding gate or (2) has been refused carriage because he or she has acted, or can be reasonably believed to act in the future, in a manner prohibited by Conditions of Carriage.

### b. *Mrs. Kruger*

Defendants correctly argue that Mrs. Kruger is not entitled to a refund because she was "unable to present herself for timely boarding of [Flight 17] because of the on-going police investigation." (Def.'s Mem. at 4.) Mrs. Kruger was stopped at the gate by VAA employee Paul Brunning and denied boarding because the police wanted to talk to her about the incident that occurred as she disembarked Flight 301. (Def.'s 56.1 Stmt. ¶ 67.) Plaintiffs contend that Mrs. Kruger was excluded from the flight even before the police were involved. (Pls.' 56.1 Resp. ¶ 64.) However, the deposition testimony of Paul Brunning which Plaintiffs cite in support of that contention shows that Mrs. Kruger was indeed prevented from boarding Flight 17 because of police involvement. (*Id.* citing the deposition of Paul Brunning 22:13–20.) ("[Brunning] told [the Krugers] that the police were having to speak with—were coming up to speak to them for [the] incident . . . the police were going to have to speak to them, so this was going to mean that certainly Mrs. Kruger wouldn't be able to travel"). Accordingly, Mrs. Kruger is not entitled to a refund because she did not timely present herself

for boarding as required by Article 6.3 of the Conditions of Carriage. *See also Giuffre*, 2012 WL 3988981, at *4–5 (an airline did not breach its contract with plaintiff passengers denied boarding that did not meet check-in deadlines set forth in the terms of the parties' contract of carriage).

Even if the Court were to find that Mrs. Kruger was refused carriage despite timely presenting herself for boarding, she is not entitled to a refund. Articles 7 and 11 of the Conditions of Carriage both allow VAA to deny boarding to a passenger that has engaged in threatening or abusive behavior directed at a member of the crew. (Conditions of Carriage arts. 7.1, 11.1.3.) VAA staff were operating under the assumption based on Skinner's report—either legitimate or erroneous—that Mrs. Kruger had physically assaulted a VAA crew member. Therefore, VAA had the right to deny Mrs. Kruger boarding without refund under either Article 7 or 11 of its Conditions of Carriage because she was believed to have engaged in contractually prohibited behavior. Article 10 does not mandate a refund or alternative carriage when a passenger is found in violation of either Article 7 or 11. Accordingly, VAA had no obligation to refund Mrs. Kruger's ticket and is entitled to judgment as a matter of law.

### c. *Mr. Kruger*

It is undisputed that Sheldon Kruger chose not to board Flight 17 so that he could remain in England while his wife was under police custody. (Def.'s 56.1 Stmt. at ¶¶ 82–84; Pls.' 56.1 Resp. ¶ 83.) He was not denied boarding and was given a full refund for his unused ticket. (Def.'s 56.1 Stmt. at ¶ 85.) Plaintiffs do not contest that Mr. Kruger's decision to remain in England was his own or that VAA refunded his ticket. As such, Mr. Kruger has no valid claim and VAA is entitled to judgment as a matter of law because he was not denied boarding and was provided with a refund.

### III. *VAA Is Entitled to Summary Judgment on Plaintiffs' Tort Claims*

Mrs. Kruger brings state law tort claims for false arrest,[6] malicious prosecution, intentional infliction of emotional distress ("IIED"),[7] and negligence. (*See* Compl. ¶¶ 38–46, 47–50, and 51–52, respectively.) Mr. Kruger also brings a claim for loss of consortium. (Compl. ¶¶ 53–58.) VAA seeks summary judgment on these claims collectively as, among other things, preempted by the Montreal Convention. I respectfully recommend that VAA's motion for summary judgment be granted as all of Plaintiffs' tort claims are preempted by the Montreal Convention.[8]

### A. *Montreal Convention*

VAA argues that Plaintiffs' tort claims should be dismissed because they are

---

**6.** Plaintiffs plead claims for both false arrest and false imprisonment. False arrest and false imprisonment are essentially the same tort under New York law and will be considered as a single claim. *Mitchell v. Home*, 377 F.Supp.2d 361, 376 (S.D.N.Y.2005).

**7.** Mr. Kruger also brings a claim of IIED based upon the same events. (Compl. ¶¶ 48–49.) The Krugers' IIED claims are governed by English law under New York's interest analysis because the alleged tort occurred in England and the conflicting laws regulate

conduct. *See Youngman v. Robert Bosch LLC*, 923 F.Supp.2d 411, 416–17 (E.D.N.Y.2013).

**8.** Because I recommend that Your Honor grant VAA's motion with respect to Plaintiffs' state law claims based on the preemptive effect of the Montreal Convention, I do not separately analyze those claims on their own. If called upon to do so, however, I would recommend that Your Honor grant VAA's motion with respect to Plaintiffs' intentional tort claims—false arrest, malicious prosecution and IIED. VAA could not be held vicariously liable for Skinner's intentional torts because

barred by the terms of the Montreal Convention (or "Convention"). (*See* Def.'s Mem. at 9, 8–15.) VAA contends that the claims are within the substantive scope of the Convention and thus fail because Plaintiffs suffered no bodily injury as required for recovery under the Convention. (*Id.*) Plaintiffs argue that the Convention does not apply because the events that provide the basis for their claims did not arise onboard the aircraft or during the process of disembarking or embarking.[9] (Pls.' Opp. at 17, 14–18.)

### i. *Preemptive Effect of the Montreal Convention*

The Montreal Convention, successor to the Warsaw Convention,[10] governs interna-

tional air carrier liability. *See* The Convention for the Unification of Certain Rules for International Carriage by Air ("Montreal Convention"), May 28, 1999, reprinted in S. Treaty Doc. No. 106–45, 1999 WL 33292734 (2000); *Weiss v. El Al Israel Airlines, Ltd.*, 433 F.Supp.2d 361, 364 (S.D.N.Y.2006) *aff'd sub nom. Weiss v. El Al Israel Airlines*, 309 Fed.Appx. 483 (2d Cir.2009). The treaty applies to "all international carriage of persons . . . by aircraft for reward." Montreal Convention Art. 1(1). It is meant to limit airlines' liability during international air carriage while also protecting the rights of passengers. *Weiss*, 433 F.Supp.2d at 364. The Convention has three damage provisions that allow recovery for: "1) death or bodily

the requisite intent for each tort would remove her actions from the scope of her employment and thus absolve VAA from any vicarious liability. *Compare Higazy v. Millennium Hotel & Resorts*, 346 F.Supp.2d 430, 453–454 (S.D.N.Y.2004) (finding that false reports to the FBI causing a plaintiff's arrest are outside the scope of an individuals employment and employer cannot be held liable for intentional torts based upon such reports under the theory of respondeat superior); *with TADCO Const. Corp. v. Dormitory Auth. of State of New York*, 700 F.Supp.2d 253, 268 (E.D.N.Y.2010) (a civilian defendant who furnishes information to authorities will not generally be held liable for false arrest unless the defendant knowingly intended to confine the plaintiff without reasonable cause); *and Rothstein v. Carriere*, 373 F.3d 275, 292 (2d Cir. 2004) (a claim for malicious prosecution fails unless the defendant commences or continues a criminal proceeding against the plaintiff with actual malice); *and Cutler v. Bank of Am. Nat. Trust & Sav. Ass'n*, 441 F.Supp. 863, 864 (N.D.Cal.1977) (citing *Wilkinson v. Downtown*, 2 Q.B. 57 (1897)) (IIED claim under English law requires that the defendant "wilfully did an act plainly calculated" to cause nervous shock). I would, however, recommend that Your Honor deny VAA's motion with respect to Plaintiffs' negligence and loss of consortium claims. Material issues of fact exist regarding the veracity of Skinner's statements to the police which make summary

judgment inappropriate because VAA has failed to show that it did not owe Mrs. Kruger a duty to prevent its employees from reporting false accusations to the police. (*See* Compl. ¶ 20) (alleging that as a common carrier VAA had a duty to "be honest, truthful and careful about supporting a claim of violation of law"); see also *Vumbaca v. Terminal One Grp. Ass'n L.P.*, 859 F.Supp.2d 343, 364 (E.D.N.Y.2012) (a duty to prevent against the conduct of others may arise where there is a relationship between the defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions, such as the employer-employee relationship); *Alvarez v. Am. Airlines, Inc.*, 98 CIV. 1027(MBM), 1999 WL 691922, at *6 (S.D.N.Y. Sept. 7, 1999) (loss of consortium is a derivative claim and survives along with a negligence claim).

**9.** Plaintiffs do not contend that Mrs. Kruger suffered bodily injury as defined by the Convention but only argue that the claims are not within the scope of Convention.

**10.** The Montreal Convention, including its Articles relevant to this litigation, is "largely substantially unchanged from [the Warsaw Convention] and is construed using case law interpreting that treaty." *Hunter v. Deutsche Lufthansa AG*, 863 F.Supp.2d 190, 205 (E.D.N.Y.2012).

injury suffered by an airline passenger or the destruction, loss of or damage to her baggage, provided the harm occurred onboard or in the process of embarking or disembarking (Article 17); 2) loss or destruction of baggage or other cargo sustained during carriage by air, subject to certain exclusions (Article 18); and 3) delay in the carriage of passengers, baggage or cargo (Article 19)." *Seagate Logistics, Inc. v. Angel Kiss, Inc.*, 699 F.Supp.2d 499, 505 (E.D.N.Y.2010) (citing *Weiss*, 433 F.Supp.2d at 365). If an action for damages falls under one of the above provisions, "the Convention provides the sole cause of action under which a claimant may seek redress for his injuries." *Weiss*, 433 F.Supp.2d at 365. As such, if Plaintiffs' state law tort claims against VAA are within the substantive scope of the Convention they are preempted. *See Vumbaca v. Terminal One Grp. Ass'n L.P.*, 859 F.Supp.2d 343, 364 (E.D.N.Y.2012) (the Convention preempts all state law claims for damages against air carriers when operative). Here, Article 17 of the Convention is the relevant provision for considering Plaintiffs' tort claims.

ii. *Substantive Scope of Article 17*

Article 17 of the Convention provides that:

"The carrier is liable for damage sustained in case of death or *bodily injury* of a passenger *upon condition only that the accident which caused* the death or injury took place on board the aircraft or *in the course of any of the operations of embarking or disembarking.*"

Montreal Convention Art. 17 (emphasis added). "The substantive scope of this article extends to all passenger injuries occurring on board the aircraft or in the course of any of the operations of embarking and disembarking—even if the claim is not actionable under the treaty." *Vumbaca* 859 F.Supp.2d at 364 (citing *King v.*

*Am. Airlines, Inc.*, 284 F.3d 352, 359 (2d Cir.2002)) (internal quotation marks omitted). Although Article 17 provides recovery only for passengers who have suffered bodily injury, the absence of such injury "affects neither the analysis of the substantive scope of the provision nor its preemptive effect." *King*, 284 F.3d at 359 citing *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 161, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). Therefore, relief under Article 17 is the exclusive remedy where claims regard an "accident" that occurred onboard the aircraft, or during the embarkation/disembarkation process, regardless of whether the claimant suffered bodily injury.

a. *"Accident"*

■ The Supreme Court has held that an incident is an "accident" within the scope of Article 17 if the "[alleged] injury is caused by an unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks*, 470 U.S. 392, 405, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). However, "an injury resulting from routine procedures in the operation of an aircraft or airline can be an 'accident' if those procedures or operations are carried out in an unreasonable manner." *Fishman by Fishman v. Delta Air Lines, Inc.*, 132 F.3d 138, 143 (2d Cir.1998). "This definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Saks*, 470 U.S. at 405, 105 S.Ct. 1338.

VAA argues that Skinner's allegedly false report of assault and subsequent arrest constitute an "accident" because it was an "unexpected or unusual event or happening" external to Mrs. Kruger. (Def. Mem. at 11 (citing *Saks*, 470 U.S. at 405, 105 S.Ct. 1338).) Plaintiffs do not argue that the events do not constitute an "accident" under the Convention, only that the

events did not occur on an aircraft or while embarking or disembarking.

To determine whether VAA is correct, the Court must establish what "event or happening" forms the basis of the "accident." Here, Plaintiffs' claims are based on Mrs. Kruger's arrest following Skinner's purportedly false report that Mrs. Kruger assaulted her. A passenger on an international flight does not expect to be arrested after a flight attendant fabricates a claim of assault against them. This alleged fabrication was external to Mrs. Kruger as it was not a product of her own will or volition. Finally, even if the report and arrest were to be considered "routine procedure in the operation of aircraft," the *false* report of an assault is certainly an unreasonable application of those procedures. *See Fishman by Fishman,* 132 F.3d at 143. Therefore, given the Court's mandate to flexibly apply the definition of accident, *Saks,* 470 U.S. at 405, 105 S.Ct. 1338, the events that provide the basis of Plaintiffs' claims are an "accident" within the scope of Article 17.

b. *Embarking/Disembarking*

VAA argues that the "accident" was within the scope of Article 17 because it involves "an uninterrupted chain of events that started with the physical contact between [Kruger] and [Skinner] onboard VAA Flight 301, and continued through to Mrs. Kruger's arrest while she was at Gate 22 engaged in 'the operations of embarking' by trying to board the connecting

flight to Newark." (Def. Mem. at 11.) Plaintiffs argue that, "the deposition testimony of the Krugers places them not on an airplane and not in between embarking and disembarking." (Pls.' Opp. at 17.) Plaintiffs stress that the claims are outside the scope of the Convention because "[j]ail is a critical element of [Mrs. Kruger's] claim of an intentional tort," and that, "jails do not have wings, and Mrs. Kruger was thoroughly disembarked when she was sent to jail, when falsely imprisoned by [VAA] staff in the terminal, and when released without prosecution." (*Id.*)

■ A claim is within the substantive scope of Article 17 only when the "accident" occurred while the passenger was either onboard the aircraft or in the course of any of the operations of embarking or disembarking the aircraft. Montreal Conv. Art. 17. The Second Circuit applies a "flexible multi-factor test" to determine whether a passenger was embarking or disembarking.[11] *Hunter v. Deutsche Lufthansa AG,* 863 F.Supp.2d 190, 205 (E.D.N.Y.2012) (citing *Buonocore v. Trans World Airlines, Inc.,* 900 F.2d 8, 10 (2d Cir.1990)) (internal quotation marks omitted). The factors to be considered are: "(1) the activity of the passengers at the time of the accident; (2) the restrictions, if any, on their movement; (3) the imminence of actual boarding; and (4) the physical proximity of the passengers to the gate." *Singh v. N. Am. Airlines,* 426 F.Supp.2d 38, 46 (E.D.N.Y.2006) (citing

11. Plaintiffs argue that there is a "bright line test" used in this Circuit to determine whether or not a passenger is embarking or disembarking. (Pls.' Opp. at 15.) In addition to failing to provide what that "bright line test" may be, Plaintiffs argument ignores the well-established factors used in this Circuit to determine whether an "accident" is within the scope of Article 17. *See Hunter,* 863 F.Supp.2d at 205; *Buonocore,* 900 F.2d at 10. Instead, Plaintiffs seem to contend that the

"accident" is outside the scope of the convention because the operative events did not occur while Mrs. Kruger was physically onboard the aircraft. (*See* Pls.' Opp. at 16 ("[Kruger] accosted and held hostage first at an information kiosk ... later in a hallway outside her connecting flight's gate ... in a free hallway with non-passengers").) That is simply not the law. *See Hunter,* 863 F.Supp.2d at 207.

*Buonocore v. Trans World Airlines, Inc.,* 900 F.2d 8, 10 (2d Cir.1990)). Importantly, it is the situs of the alleged *accident,* rather than the location where the *damages* are sustained, that guides this determination.[12] *Singh,* 426 F.Supp.2d at 47. "Due to the intentionally flexible and functional nature of [this] analysis, courts have avoided blanket characterizations of which accidents are 'always' or 'never' covered by Article 17." *Alleyn v. Port Auth. of New York,* 58 F.Supp.2d 15, 20 (E.D.N.Y.1999). The fact that a passenger was denied permission to board does not preclude a finding that she was engaged in the process of embarking. *See Matveychuk v. Deutsche Lufthansa, AG,* 08–CV–3108 (JG) (RML), 2010 WL 3540921, at \*3 (E.D.N.Y. Sept. 7, 2010) (citing *King v. American Airlines, Inc.,* 284 F.3d 352, 360 (2d Cir.2002)). A court's determination will depend on the facts of the case and how similar or dissimilar those facts are from previously decided cases. *Alleyn,* 58 F.Supp.2d at 20. "Courts applying these factors have consistently held that Article 17 covers injuries sustained close in time to the boarding process and in areas that are near departure gates and limited to ticketed passengers." *Matveychuk,* 2010 WL 3540921, at \*3.

Mrs. Kruger clearly was not on the aircraft when the "accident" occurred. As such, the Court must analyze the facts considering the factors described above to determine whether she was "in the course of any of the operations of embarking or disembarking." Montreal Convention Art. 17.

The first factor considers the activity of the passenger at the time of "accident."

*Buonocore,* 900 F.2d at 10. Mrs. Kruger exited Flight 301 with the sole intention of proceeding directly to Gate 22 so that she could board her connecting flight. All of the operative events that constitute the "accident" occurred while Mrs. Kruger was either exiting the Flight 301, walking through the jetway and terminal, or waiting outside Gate 22. Although she was not actively boarding the aircraft when she was arrested, her activity during this time period still strongly favors the conclusion that she was embarking because she intended to reach and board her connecting flight. *See Jefferies v. Trans World Airlines, Inc.,* 1987 WL 8168, at \*4 (N.D.Ill. Mar. 17, 1987) (finding that a passenger not acting under explicit instructions of the airline does not remove plaintiffs activity from the operations of embarkment).

The second factor to consider is the degree restriction on the passenger's movement. *Buonocore,* 900 F.2d at 10. Mrs. Kruger was in an open terminal and presumably free to roam until the police detained her. Nevertheless, if she had wandered off or strayed too far she would have missed her connecting flight which can serve as an implicit restriction on her movement. *See Id.* (the risk of missing a flight supports a finding that the accident occurred while embarking).

The third factor—the imminence of actual boarding—weighs strongly in favor of finding that Mrs. Kruger was embarking because the boarding process was underway when Skinner was speaking to the police at the gate, and when Mrs. Kruger was arrested.

The final factor—the passenger's physical proximity to the gate—also militates

---

**12.** Plaintiffs also argue that their state tort claims cannot be preempted because certain elements of her claim, presumably her emotional distress, accrued at the jail. The mere fact that damages were not suffered during the embarkation or disembarkation process does not preclude application of Article 17 because the analysis focuses on the situs of the "accident." *Singh,* 426 F.Supp.2d at 47.

toward a finding of embarkation. The initial alleged false report occurred onboard the aircraft when Skinner informed her captain, who in turn informed the police, that Mrs. Kruger assaulted her. (Pls.' 56.1 Stmt. ¶ 21; Def.'s 56.1 Resp. ¶ 21.) Although it is impossible to know whether Mrs. Kruger was on the jetway or in the terminal at the time of that report, she had to have been either on the jetway leaving Flight 301 or somewhere in the terminal walking towards Gate 22. (Def.'s 56.1 Stmt. ¶ 61; L. Kruger Dep., 60:17–24.) Furthermore, Mrs. Kruger was at or near the gate when Skinner spoke with the police and Mrs. Kruger was arrested. The mere fact that Mrs. Kruger was neither on the airplane nor had not passed through Gate 22 does not negate her proximity to the gate. *See Matveychuk,* 2010 WL 3540921, at *3 (Article 17 consistently applies to areas near departure gates even where passenger is denied boarding).

Whether or not a passenger was engaged in any of the operations of embarking or disembarking also depends on how similar or dissimilar the facts of the case are from those previously decided. *Alleyn,* 58 F.Supp.2d at 20. Here, the factual circumstances of Plaintiffs' claims are similar to cases in which courts have found that the "accident" occurred while the passenger was in the process of embarking or disembarking. *See, e.g., Matveychuk,* 2010 WL 3540921, at *3 (plaintiff was in process of embarking when assaulted by airline agent in a bathroom on her way to a ticketing desk to rebook a connecting flight that she had missed); *Rajcooar v. Air India Ltd.,* 89 F.Supp.2d 324, 327 (E.D.N.Y.2000) (plaintiff was in process of embarking when he had checked in for his flight and suffered a heart attack while walking to his departure gate at Heathrow Airport); *King v. Am. Airlines, Inc.,* 284 F.3d 352, 359–360 (2d Cir.2002) (plaintiffs were in the process of embarking when

they were denied boarding and "bumped" from their connecting flight to a later flight allegedly because of their race).

This case is also distinguishable from those in which courts have found that passenger was not engaged in any of the operations of embarking or disembarking. In *Buonocore,* for example, the court found that a terrorist attack killing a passenger standing at a snack counter two hours prior to his flight did not occur during the operations of embarking. *Buonocore,* 900 F.2d at 10. The court in *Buonocore* focused on the fact that the victim passenger was not near his gate or in engaged in any boarding activity when the "accident" occurred distinguishing it from a prior case where victim passengers were at the gate within minutes of boarding and "risked missing [their] flight if they strayed." *Id.* (distinguishing *Day v. Trans World Airlines, Inc.,* 528 F.2d 31 (2d Cir. 1975)). The instant case is also dissimilar from *Hunter,* 863 F.Supp.2d 190, despite Plaintiffs' contention that the two are "identical." (Pls.' Opp. at 15.) In *Hunter,* the plaintiff had ample time to roam freely around the airport, was likely nowhere near the departure gate when he engaged in underlying conversations that formed the basis of his claim, and did not have to board his flight for a couple hours when the "accident" occurred. *Hunter,* 863 F.Supp.2d at 206. Here, Mrs. Kruger was not able to roam freely around the airport since she had to catch her connecting flight and was at the departure gate as boarding was ongoing when many of the underlying events took place.

Considering the above, the relevant case law and controlling factors—location, activity, control, and imminence—dictate a finding that Mrs. Kruger was in the process of embarking or disembarking when the "accident" occurred. Therefore, Plaintiffs' state law tort claims are preempted be-

cause they are within the substantive scope of Article 17 of the Montreal Convention.

### iii. *Bodily Injury*

A carrier is only liable for an "accident" under Article 17 if the claimant sustained death or "bodily injury." Montreal Convention Art. 17. However, Article 17 encompasses all "accidents" that occur during embarking and disembarking even if the claim otherwise fails under the treaty. *King*, 284 F.3d at 359. Therefore, Mrs. Kruger has no claim under the Convention if she did not suffer "bodily injury" because the action is within the substantive scope of Article 17.

VAA argues that Mrs. Kruger's claim is for purely mental injuries, including Post Traumatic Stress Disorder ("PTSD"), and fails under the Convention.[13] (Def.'s Mem. at 14.) Although Mrs. Kruger does not allege that any physical injury was directly caused by the "accident" itself, she has been diagnosed with post traumatic stress disorder as a result of the incident and claims that she has suffered from panic attacks and "other physical ailments" because of her emotional trauma. (Compl. ¶ 49; Pls.' Opp., Exh. 10.) Accordingly, the Court must consider whether Mrs. Kruger may recover any of the following as "bodily injury": (1) her emotional or psychic trauma caused by the "accident"; (2) her physical manifestations of emotional harm;[14] and (3) her PTSD directly attributable to the "accident."

Mrs. Kruger cannot recover for her purely emotional, mental, or psychic trauma. In *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991), the Supreme Court found that the text of Article 17—"lesion corporelle" in the original French of the treaty— "does not permit recovery for purely psychic injuries." *Floyd*, 499 U.S. at 536, 111 S.Ct. 1489. Importantly, the Court held that a narrow reading of the term "bodily injury" was appropriate given the French legal meaning of the term, the negotiating history of the treaty, and that the purpose of the Convention was to limit the liability of air carriers in order to foster growth of the industry. *Id.* at 542–46, 111 S.Ct. 1489 citing *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 256, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984). *Floyd* concluded that, "an air carrier cannot be held liable under Article 17 when an accident has not caused a passenger to suffer death, physical injury, or physical manifestation of injury." *Id.* at 552, 111 S.Ct. 1489. However, the Court specifically declined to express a view "as to whether passengers can recover for mental injuries that are *accompanied* by physical injuries." *Id.* (emphasis added). In an exhaustive examination of the treaty negotiation, its original French text and meaning, as well as decisions of signatory nations, the Second Circuit more recently ruled that "a carrier may be held liable under Article 17 for mental injuries only if they are caused by bodily injuries." *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 400 (2d Cir.2004). As such, Mrs. Kruger is completely barred from recovering any damages for the emotional stress that she alleges because they are not caused by any bodily injuries.[15]

---

**13.** Plaintiffs do not address the Convention's "bodily injury" requirement, but rather only argue that their claim is outside the substantive scope of Article 17.

**14.** Plaintiffs do not set forth what "other physical ailments" Mrs. Kruger suffers from

as a result of her arrest in the complaint or other papers. Nevertheless, Mrs. Kruger did experience a panic attack in July, 2011, which she claims was caused by emotional trauma from the incident.

The Court must also consider whether Mrs. Kruger may recover for her panic attacks that occurred long after the "accident." The issue of whether a plaintiff can recover for physical manifestations of purely mental or emotional injury has been visited by courts in this and other districts with varying outcomes. In *Floyd*, the Supreme Court only stated that an air carrier can be held liable when an accident within the scope of Article 17 causes "death, physical injury, or physical manifestation of injury." *Floyd*, 499 U.S. at 552, 111 S.Ct. 1489. This language neither expressly allows for, nor prohibits, recovery of physical manifestations of emotional injury. However, courts in this and other circuits have found that a claim under Article 17 cannot be based on physical symptoms that are a result of emotional injury or distress.

In *Turturro v. Cont'l Airlines*, 128 F.Supp.2d 170 (S.D.N.Y.2001), the court held that the plaintiffs shortness of breath, sleeplessness, or inability to concentrate arising from her emotional distress caused by a delay in deplaning were purely non-compensable psychosomatic injuries. 128 F.Supp.2d at 178. The *Turturro* court stressed that, "[a]t every stage of its analysis, the [Supreme Court in *Floyd*] focused on bodily injury, not subsequent manifestations, concluding that the bodily injury requirement has a distinctly physical scope." *Id.* at 177 (citing *Terrafranca v. Virgin Atl. Airways Ltd.*, 151 F.3d 108, 109 (3d Cir.1998)) (internal quotation marks and citation omitted). *Turturro* found that it was "authoritative and workable" to interpret *Floyd* as barring recovery for physical manifestations of emotional trauma because a number of lower courts have done so. *Id.* at 178; *see also Carey v. United Airlines, Inc.*, 77 F.Supp.2d 1165, 1168–1171 (D.Or.1999) ("[n]ausea, cramps, perspiration, nervousness, tension, and insomnia" caused by public humiliation were purely psychic and not recoverable under *Floyd* ); *Hermano v. United Airlines*, C 99–0105 SI, 1999 WL 1269187, at *4 (N.D.Cal. Dec. 21, 1999) (alleged headaches, panic attacks, and palpitations caused by wrongfully removing plaintiff from airplane are not sufficient to constitute physical injury under the Convention); *Terrafranca*, 151 F.3d at 111–112 (post-traumatic stress disorder complicated by anorexia, loss of desire to socialize, and weight loss after plaintiff was informed by flight crew that the aircraft was under a bomb threat was not "bodily injury"); *Tseng v. El Al Israel Airlines, Ltd.*, 919 F.Supp. 155, 158 (S.D.N.Y.1996) (personal injuries attributable to shock or outrage experienced as a result of an unwarranted bodily search by airline agent is purely psychic injury barred by *Floyd* ).[16] As

---

**15.** The issue of whether Mrs. Kruger's alleged PTSD constitutes a "bodily injury" caused by the "accident" is addressed below.

**16.** *Tseng* was reversed by the Second Circuit on an unrelated preemption issue and then the Circuit was reversed by the Supreme Court. *See Tseng v. El Al Israel Airlines, Ltd.*, 122 F.3d 99 (2d Cir.1997); *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). "The question of whether the symptoms expressed by the plaintiff amounted to the required 'bodily injury' was not at issue before the Second Circuit and was not before the Supreme Court [in *Tseng* ]." *Carey*, 77 F.Supp.2d at 1172–73. Nevertheless, this Court, and others, finds it significant that the Supreme Court wrote that, "[plaintiff] alleges psychic or psychosomatic injuries, but no 'bodily injury,' as that term is used in the Convention." *Tseng*, 525 U.S. at 160, 119 S.Ct. 662. This is "an indication that the Supreme Court would likely not find injuries purely descended from emotional distress to be compensable under the Convention." *Carey*, 77 F.Supp.2d at 1173.

such, the panic attacks suffered by Mrs. Kruger are not "bodily injury" under Article 17 because they are merely products of her emotional distress caused by the "accident" rather than physical injuries directly attributable to it.

Finally, I find that Mrs. Kruger's PTSD is not a recoverable "bodily injury" under Article 17. "[E]xtreme stress, such as a near-death experience or being taken hostage, can actually change brain cell structure and cause a specific area of the brain to atrophy. Although not every PTSD patient will display the same biological abnormalities, objective evidence exists in some cases that brain damage has ensued." *Turturro*, 128 F.Supp.2d at 178–79. Under the controlling language of *Floyd*, "bodily injury" encompasses "a change in the structure of an organ." *Floyd*, 499 U.S. at 541, 111 S.Ct. 1489. Therefore, some courts have found that where there exists sufficient evidence, "an accident victim's PTSD can itself constitute a physical injury because it results in discernible physical changes to the structure of the brain." *Ligeti v. British Airways PLC*, 00–CV–2936 (FM), 2001 WL 1356238, at *5 (S.D.N.Y. Nov. 5, 2001) (citing *Turturro*, 128 F.Supp.2d at 178); see, e.g., *In re Air Crash at Little Rock, Ark.*, 118 F.Supp.2d 916, 924 (E.D.Ark. 2000) (severe PTSD with physical effects found to be a recoverable physical manifestation of injury); *Weaver v. Delta Airlines, Inc.*, 56 F.Supp.2d 1190, 1192 (D.Mont. 1999) (considering scientific research explaining that post-traumatic stress disorder can result in actual trauma to brain cell structures).

Even if the Court were to accept the proposition that extreme PTSD causing a change in the structure of the brain were a "bodily injury" under Article 17, Plaintiffs have put forth no evidence that Mrs. Kruger suffered such an injury. Although not alleged in the Complaint, Plaintiffs claim that Mrs. Kruger suffers from PTSD as a result of the accident and that the condition has been "confirmed by a treating therapist and a nationally based PTSD evaluation examination." (Pls.' Opp. at 9.) In support of that claim, Plaintiffs cite an evaluation report prepared by Mrs. Kruger's treating psychologist, Harry A. Olson, Ph.D. (Pls.' Opp., Exh. 10.) In the report, Dr. Olson writes that "[a]ll of [Mrs. Kruger's] symptoms are consistent with the condition of [PTSD]." (*Id.*) In their 56.1 response to VAA's motion, Plaintiffs claim that, "... the frontal lobes of [Mrs. Kruger's] brain are believed to be swollen and enlarged as is the case with PTSD." (Pls.' 56.1 Resp. ¶ 111.) However, Plaintiffs do not specify whether this "belief" is one held by Dr. Olson or merely Plaintiffs' counsel and nowhere in his report does Dr. Olson reference or document any belief that discernible physical changes have occurred to the structure of Mrs. Kruger's brain as a result of her PTSD. (*See* Pls.' Opp., Exh. 10.) Dr. Olson merely writes that Mrs. Kruger's symptoms are *consistent* with PTSD and describes the impact the affliction has had on her day to day life. (*Id.*) Plaintiffs have also not provided any objective medical evidence of such swelling or other changes in Mrs. Kruger's brain. As such, Mrs. Kruger's PTSD is not a "bodily injury" because she has not put forth any evidence that the mental affliction has caused a physical change in her brain.[17] *See Ligeti*, 2001 WL 1356238,

---

**17.** Moreover, in opposing VAA's arguments for preemption under Article 17, Plaintiffs write that it is, "PTSD and *other* emotional damages which make up [Mrs. Kruger's] loss ..." (Pls.' Opp. at 17) (emphasis added). Because Plaintiffs describe Mrs. Kruger's PTSD as an *other* emotional damage they potentially concede that there is no recoverable physical component to her PTSD.

at *5 (PTSD not a recoverable "bodily injury" because plaintiff failed to adduce any evidence that her brain underwent physical changes as a consequence of the incident); *Turturro*, 128 F.Supp.2d at 179 (plaintiff did not show a "bodily injury" where she did not advance a brain-lesion theory of PTSD or provide individualized proof of such lesions with "requisite specificity").

Careful consideration of *Floyd* and its progeny show that Plaintiffs' claims under the Convention fail because Mrs. Kruger has not suffered any "bodily injury" as a result of the "accident." Therefore, I respectfully recommend that Plaintiffs' claims under the Convention be dismissed to the extent that any such claims have been made.[18]

### IV. Plaintiffs' Motion for Summary Judgment on VAA's Affirmative Defenses

My recommendation that Your Honor grant VAA's motion for summary judgment in its entirety moots Plaintiffs' motion for summary judgment on VAA's affirmative defenses. Accordingly, I recommend that Plaintiffs' motion be denied.[19]

### CONCLUSION

For the foregoing reasons, I respectfully recommend that Your Honor grant VAA's motion for summary judgment in its entirety, and deny Plaintiffs' motion for summary judgment as moot.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court and the Honorable Nicholas

---

18. Mr. Kruger's attendant loss of consortium claim should be dismissed along with the others. Under Article 17, loss of consortium claims are "answered by the domestic law selected by the courts of the contracting states." *Zicherman v. Korean Air Lines, Co. Ltd.*, 516 U.S. 217, 225, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). The parties agree, as do I, that English and New York law do not differ for Plaintiffs' claims in this regard. Accordingly, New York choice of law analysis dictates that New York law applies. In New York, loss of consortium is a derivative claim and fails "unless the defendant is liable to the injured spouse whose injury in turn caused the spouse to suffer." *Alvarez*, 1999 WL 691922, at *6 (S.D.N.Y. Sept. 7, 1999). Therefore, Mr. Kruger's claim should be dismissed because VAA is not liable to Mrs. Kruger under Article 17.

19. Were Your Honor to disagree with my recommendation that VAA's motion for summary judgment be granted, I would recommend the following as to Plaintiffs' motion for summary judgment on VAA's affirmative defenses. First, Your Honor should grant Plaintiffs' motion as to VAA's eleventh (preemption under the ADA), and ninth, tenth, and twelfth (preemption under the Montreal Convention) affirmative defenses. If the ADA and the

Montreal Convention do not apply, they cannot be the basis for an affirmative defense. Second, Your Honor should deny Plaintiffs' motion as to VAA's sixth affirmative defense (lack of respondeat superior). An issue of material fact exists as to whether Skinner was acting within the scope of her employment when she reported Mrs. Kruger to the police. *See Overton v. Ebert*, 180 A.D.2d 955, 956, 580 N.Y.S.2d 508 (1992) (the determination of whether an individual was acting within the scope of their employment is highly factual and typically one for the jury). Third, Your Honor should grant Plaintiffs' motion as to VAA's fifteenth affirmative defense (*forum non conveniens*). VAA has conceded in a letter to the Court that "[*forum non conveniens*] [ ] is no longer at issue in this litigation." (Dkt. No. 15.) Fourth, Your Honor should grant Plaintiffs' motion as to VAA's second affirmative defense (Act of State Doctrine). None of Plaintiffs' claims regard the acts of another sovereign nation. Fifth, Your Honor should grant Plaintiffs' motion as to VAA's seventeenth and eighteenth affirmative defenses (affirmative defenses to defamation claims). Although Plaintiffs extensively brief New York defamation law in their summary judgment papers, there is no such independent claim in their Complaint and the defenses thus serve no purpose in this action.

G. Garaufis within fourteen days of receipt hereof. Responses thereto are due seven days thereafter. Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).

Dated: August 13, 2013